UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

GEORGINA MORGENSTERN,

                              Plaintiff,

        -against-

COUNTY OF NASSAU; NASSAU LOCAL 830, CIVIL
SERVICE EMPLOYEES ASSOCIATION, INC.; THOMAS R.
SUOZZI, in his individual and official capacities; ANTHONY
M. CANCELLIERI, in his individual and official capacities;
PATRICIA BOURNE, in her individual and official capacities;
JOHN P. DONNELLY, in his individual and official capacities,

                              Defendants.
------------------------------------------------------------------------X

**04-CV-0058
(JS)(ARL)**

**COUNTY
DEFENDANTS'
STATEMENT OF
MATERIAL FACTS
PURSUANT TO LOCAL
CIVIL RULE 56.1**

Defendants, COUNTY OF NASSAU, THOMAS R. SUOZZI, ANTHONY M. CANCELLIERI, PATRICIA BOURNE, and JOHN P. DONNELLY, in their individual and official capacities (hereinafter referred to collectively as the "County Defendants"), by their attorney, LORNA B. GOODMAN, Nassau County Attorney, by the undersigned counsel, hereby submit this statement of material facts pursuant to Local Civil Rule 56.1, as to which the County Defendants contend there is no genuine issue of material fact to be tried.

## PARTIES

### The County Defendants

1.      Defendant County of Nassau ("the County") is a municipal corporation duly organized and existing pursuant to the laws of the State of New York.  (Second Amended Compl. ¶ 10; Nassau County Charter, § 101).

2.       Defendant Thomas R. Suozzi ("County Executive Suozzi") was elected as County Executive of the County in November 2001, and is currently serving his second term.

(Second Amended Compl. ¶ 13; Biography of Thomas R. Suozzi, available at *http://www.nassaucountyny.gov/agencies/CountyExecutive/Biography.html*).

3.      County Executive Suozzi is responsible for, *inter alia*, preparing and presenting an annual budget to the County Legislature; supervising, directing and controlling the administration of all County departments, offices, and functions of the County government; maintaining the efficient operation of the County government; appointing and removing department heads and employees in the Office of the County Executive; and designating deputies.  (Nassau County Charter, § 202, § 203, § 205).

4.      Defendant Anthony M. Cancellieri ("Defendant Cancellieri") is the former Chief Deputy County Executive of the County.  (Cancellieri Dep. at p.13, lines 7-9).

5.      Defendant Cancellieri was employed by the County from January 1, 2002 to December 31, 2005. (Cancellieri Dep. at p.14, lines 7-11).

6.      Defendant Cancellieri was appointed to the position of Chief Deputy County Executive by County Executive Suozzi in or about 2003.  (Cancellieri Dep. at p.13, lines 10-20, p.14, lines12-20).

7.      As Chief Deputy County Executive, Defendant Cancellieri was responsible for overseeing the daily operations of the County, coordinating 47 departments within the County, and overseeing the performance of 9,000-plus employees of the County.  (Cancellieri Dep. at p.27, lines 17-22).

8.      As Chief Deputy County Executive, Defendant Cancellieri had the authority to hire and terminate County employees.  (Cancellieri Dep. at p.20, lines 20-25, p.31, lines 2-25, p.32, lines 2-9).

2

9.      Defendant Patricia Bourne ("Defendant Bourne") is employed by the County as the Executive Commissioner of the Nassau County Planning Commission.  (Bourne Dep. at p.12, lines 18-21).

10.     Defendant Bourne has been employed by the County since 2002.  (Bourne Dep. at p.12, lines 15-17).

11.     As Executive Commissioner of the Nassau County Planning Commission, Defendant Bourne is the head of the Nassau County Planning Department ("Planning Department").  (Nassau County Charter § 1601).

12.     From 2002 to 2005, Defendant Bourne was the Director of the Nassau County Planning Department.  (Bourne Dep. at p.12, lines 22-23, p.13, lines 2-4; p.14, lines 10-12).

13.     As Director of the Planning Department, Defendant Bourne was responsible for, *inter alia*, carrying out the polices of the Planning Commission pursuant to the County Charter; administering the Planning Department; supervising a staff; ensuring that projects were completed on time; and, managing administrative responsibilities.  (Bourne Dep. at p.32, lines 13-25, p.33, lines 2-11).

14.     As Director of the Planning Department, Defendant Bourne had the authority to terminate an employee.  (Bourne Dep. at p.99, lines 23-25, p.100, lines 2-4, p.164, lines 2-7).

15.     Defendant John P. Donnelly ("Defendant Donnelly") is employed by the County as Chief Deputy County Executive of the County of Nassau. (Donnelly Dep. at p.11, lines 6-7).

16.     Defendant Donnelly was hired by the County in October 2002 as Director of the Department of Human Resources, and served in that position for approximately a year and a half. (Donnelly Dep. at p.12, lines 14-17).

3

17.     As Director of the Department of Human Resources, Defendant Donnelly was responsible for, *inter alia*, developing and implementing human resources policies and programs, including but not limited to recruitment, compensation, benefits, and training.  (Donnelly Dep. at p.20, lines 15-20).

18.     As Director of the Department of Human Resources, Defendant Donnelly did not have the authority to stop a termination of an employee from another County agency and/or department, nor did he have the final say regarding the termination of an employee working for another County agency and/or department. (Donnelly Dep. at p.39, lines 6-24, p.40, lines 10-13).

**Defendant Nassau Local 830, Civil Service Employees Association, Inc. ("CSEA")**

19.     Defendant Nassau Local 830, Civil Service Employees Association, Inc. (hereinafter referred to as the "Union Defendant") is a labor organization with offices at 400 County Seat Drive, Mineola, New York.  (Second Amended Compl. at ¶ 12; Union Defendant's Answer to Second Amended Complaint at ¶ 4).

20.     The Union Defendant and the County have been and currently are parties to a series of collective bargaining agreements which "[seek] to assure the orderly and uninterrupted operations of the government by maintaining a harmonious relationship between the government and a unit of its employees."  The current collective bargaining agreement is effective for the period January 1, 2003 through December 31, 2007 ("CBA").  (Second Amended Compl. at ¶ 26; Union Defendant's Answer to Second Amended Complaint at ¶ 4; CSEA Agreement, County of Nassau, at p.1, *Preamble*).

**Plaintiff Georgina Morgenstern**

21.     Plaintiff Georgina Morgenstern (hereinafter referred to as "Plaintiff") is a former employee of the County of Nassau.  (Second Amended Compl. at ¶ 10).

4

22.     On August 13, 2002, Plaintiff was hired as a provisional employee with the Nassau County Department of Planning (hereinafter referred to as the "Planning Department") in the position of Planner III, a civil service position in a competitive class.  (Second Amended Compl. at ¶ 17; Morgenstern Dep. at p.20, lines 3-10, p.21, lines 2-4; Notice of Provisional Appointment, CS-13 Form, dated August 21, 2002).

23.     On October 22, 2002, Plaintiff was notified that she was subject to filing for the first available competitive examination for the Planner III position.  (Second Amended Compl. at ¶ 20).

24.     Plaintiff sat for the competitive examination for the Planner III position, Open Competitive Examination No. 62-096, which was held on November 16, 2002.  (Second Amended Compl. at ¶ 20; Reissued Announcement for Open Competitive Examination, Examination No. 62-096, Planner III).

25.     On April 17, 2003, the Nassau County Civil Service Commission established an eligibility list for the Planner III title from Exam No. 62-096.  (Nassau County Civil Service Commission Eligibility List for Planner III, established April 17, 2003, from Exam No. 62-096).

26.     On or about April 28, 2003, the County notified Plaintiff that her name had been placed on the eligibility list for the Planner III position and inquired about Plaintiff's availability for the position.  (Second Amended Compl. at ¶ 21; Canvass Letter dated Apr. 28, 2003).

27.     On May 1, 2003, Plaintiff affirmed that she was available to take the Planner III position.  (Second Amended Compl. at ¶ 21; Canvass Letter dated Apr. 28, 2003).

28.      On June 16, 2003, Plaintiff was appointed from eligible list #62-096 to the competitive civil service Planner III position at a salary of $64,176 and placed in the Graded Salary Plan at Grade 15, Step 4.  (Second Amended Compl. at ¶ 22; Appointment from an

5

Eligible List, form CS-12C, dated June 16, 2003; Plan C Graded Service Salary Schedule for the period July 1, 2002 through June 30, 2003).

29.     Upon being appointed to the Planner III position, Plaintiff was informed that she was being placed on a probationary period. (Morgenstern Dep. at p.40, lines 4-25, p.41, lines 2-7).

30.     According to the Appointment from an Eligible List Form dated June 16, 2003, signed by both Defendant Bourne and Plaintiff, Plaintiff was required to serve the maximum probationary term in the Planner III position.  (Appointment from an Eligible List, form CS-12C, dated June 16, 2003).

31.     Plaintiff was terminated from her employment with the County on December 5, 2003.  (Letter from Patricia Bourne to Georgina Morgenstern dated December 5, 2003; Report of Personnel Action: Nassau County, form CS-39, dated December 5, 2003).

### FACTS RELATING TO PLAINTIFF'S FIRST CAUSE OF ACTION UNDER *42 U.S.C. § 1983*

**Facts Concerning Plaintiff's Allegations that the County Defendants Failed to Provide Plaintiff with Due Process**

32.     Every permanent appointment from an open competitive eligibility list shall be for a specific probationary term of not less than eight weeks nor more than 26 weeks, except as otherwise provided by Article XIX(1) of the Civil Service Rules.  (Nassau County Civil Service Commission Civil Service Rules, Rule XIX (1)(a)).

33.     The CBA mandates that full-time employees in the negotiating unit serve a probationary period of 26 weeks, unless a longer, or new, or additional probationary period is provided by the Civil Service Commission Rules or by New York State Statute.  (CSEA Agreement, County of Nassau, Sec. 10-1.1).

34.     Plaintiff was a member of the negotiating unit. (Second Amended Compl. at ¶27).

35.     An employee's appointment from an open competitive eligibility list automatically becomes permanent upon satisfactory completion of the probationary term and the trial period described in Section 10 of the CBA.  (Appointment from an Eligible List, form CS-12C, dated June 16, 2003; Nassau County Civil Service Commission Civil Service Rules, Rule XIX (1)(b)).

36.     If the conduct or performance of a probationer is not satisfactory, her employment may be terminated at any time after the completion of the minimum eight-week period of service, or on or before completion of the maximum period of service.  (Nassau County Civil Service Commission Civil Service Rules, Rule XIX (1)(b)).

37.     During the 26-week probationary period, an employee holding a full-time position does not have any disciplinary protection under the CBA.  (CSEA Agreement, County of Nassau, Sec. 10-1.1).

38.     Only an employee who has passed the 26-week probationary period is entitled to use the Disciplinary Review Procedure set forth in the CBA.  (CSEA Agreement, County of Nassau, Sec. 10-1.4; Corr Dep. at p.64, lines 18-25).

39.     Plaintiff's probationary period began on June 16, 2003.  (Morgenstern Dep. at p.40, lines 18-25, p.41, lines 2-11; Bourne Dep. at p.194, lines 16-19).

40.     During her employment with the County, Plaintiff thought her probationary period ended sometime in December 2003.  (Morgenstern Dep. at p.154, lines 5-9).

41.     Defendant Bourne informed Plaintiff that her probationary period was six months and that it would end on December 16, 2003.  (Morgenstern Dep. at p.153, lines 10-12, p.154, lines 11-12; Bourne Dep. at p.179, lines 7-25, p.181, lines 4-8).

7

42.     In 2003, Bourne instructed her staff that probationary periods were 26 weeks. (Bourne Dep. at p.178, lines 15-21, p.179, lines 15-18, 24-25, p.181, lines 4-8).

43.     Early in her probationary period, Plaintiff asked Defendant Bourne why she was required to serve the six-month maximum probationary period.   (Morgenstern Dep. at p.156, lines 9-21).

44.     On Plaintiff's Appointment from an Eligible List Form dated June 16, 2003, the blank space next to the term "maximum probationary term" is filled in with the phrase "24 (twenty-four) weeks."  (Appointment from an Eligible List, form CS-12C, dated June 16, 2003; Morgenstern Dep. at p.41, lines 8-17).

45.     On Plaintiff's Change of Status Form dated June 16, 2003, the probationary term is listed as "twenty-four (24) weeks."  (Change of Status Form, CS-38, dated June 16, 2003).

46.     The 24-week probationary term was a very unusual probationary period because it was not the full 26 weeks.  (Kampe Dep. at p.69, lines 7-10, p.71, lines 16-20; Corr Dep. at p.127, line 25, p.128, lines 2-10).

47.     The 24-week probationary term listed in Plaintiff's Change of Status Form and the Appointment from an Eligible List Form, both dated June 16, 2003 (hereinafter referred to collectively as "civil service forms"), was a clerical error.  (Bourne Dep. at p.126, lines 2-16, p.127, lines 20-24, p.128, lines 2-8, p.170, line 5).

48.     Despite the fact that she signed Plaintiff's civil service forms on June 16, 2003, Defendant Bourne did not realize the clerical error on Plaintiff's civil service forms until after Plaintiff was terminated from her employment with the County.  (Bourne Dep. at 170, lines 3-5, p.173, lines 13-15, p.173, line 25, p.174, lines 2-19).

49.     During her probationary period, Plaintiff took three sick days and eight and one half vacation days, missing a total of 11½ days of work. (Employee Leave Balance Inquiry dated January 8, 2004; Morgenstern Dep. at p.155, lines 24-25).

50.     If an employee misses more than 10 work days during her probationary period, the probationary term shall be extended by the number of days absent.  (Nassau County Civil Service Commission Civil Service Rule XIX (2)).

51.     Department heads may promulgate departmental practices, so long as they do not conflict with, exceed or supersede the provisions of the CBA.  (CSEA Agreement, County of Nassau at Sec. 9-2.2).

52.     During her employment with the County, Plaintiff was involved with the preparation of the update to the Nassau County Master Plan.  (Morgenstern Dep. at p.60, lines 3-10, p.64, lines 12-19, p.74, lines 14-16; Second Amended Compl. at ¶ 38).

53.     Plaintiff was asked to present the Master Plan update to the Nassau County Planning Commission during its last meeting of the year, as required by the County Charter. (Morgenstern Dep. at p.157, lines 2-6; p.159, lines 13-18, p.170, lines 21-23).

54.     The Planning Commission meeting was held in the caucus room of the County's Legislative Chamber on Thursday, December 4, 2003.  (Morgenstern Dep. at p.161, lines 3-9, 22-24, p.174, lines 9-16).

55.     On December 4, 2003, prior to her Master Plan presentation, Plaintiff and other Planning Department staff were waiting in the Legislative Chamber while the Planning Commission members discussed issues in the caucus room. (Morgenstern Dep. at p.162, lines 4-12, p.163, lines 4-15, p.165, lines 5-9).

56.     Plaintiff had been present in the Legislative Chamber prior to the December 4, 2003 Planning Commission meeting.  (Morgenstern Dep. at p.161, lines 19-21).

57.     While Plaintiff was waiting to deliver her Master Plan presentation, she sat at the chair of the Presiding Officer of the Legislature and simulated a legislative session (Morgenstern Dep. at p.165, lines 2-4, 22-25, p.166, lines 22-24, p.167, lines 5-8).

58.     During this simulation, Plaintiff pretended that she was the Presiding Officer of the Legislature and spoke into the microphone attached to the Presiding Officer's seat, which was turned on at the time.  (Morgenstern Dep. at p.164, lines 3-18, p.167, lines 19-2, p.168, lines 8-10, p.170, lines 2-3).

59.     When turned on, the microphones in the County's Legislative Chamber broadcast throughout the executive offices located at One West Street, Mineola New York ("One West").  (Morgenstern Dep. at p.169, lines 4-18; Cancellieri Dep. at p.82, lines 14-15; Donnelly Dep. at p.133, lines 4-25, p.134, lines 2-9).

60.     During the simulation using the Presiding Officer of the Legislature's microphone, Plaintiff made disparaging statements about the County and County Executive Suozzi, which were broadcasted throughout One West.  The statements were heard by several County employees and high ranking County officials who were either present in the Legislative Chamber or in their offices at One West.  (Morgenstern Dep. at p.164, lines 5-18, p.168, lines 17-24, p.169, lines 4-7; Cancellieri Dep. at p.79, lines 5-17, p.82, lines 8-24, p.97, lines 10-13; Bourne Dep. at p.297, lines 6-21, p.298, lines 9-18; Levine Dep. at p.196, lines 10-20, p.197, lines 13-21, p.199, lines 14-21; Corr Dep. at p.117, lines 18-25, p.118, lines 2-9; Petersen Dep. at p.226, lines 6-23).

61.     The incident was reported to Defendant Cancellieri by several County employees who overheard Plaintiff's disparaging statements. (Cancellieri Dep. at p.78, line 25, pp.79-82, pp.88-91, p.97, lines 6-22).

62.     After learning of this incident, Defendant Cancellieri made the decision to terminate Plaintiff's employment with the County. (Cancellieri Dep. at p.100, lines 2-18, p.101, lines 25-25, p.102, lines 2-4, p.103, lines 8-14).

63.     It was Defendant Cancellieri's sole decision to terminate Plaintiff.  (Cancellieri Dep. at p.103, lines 15-25, p.104, lines 2-16; Bourne Dep. at p.402, lines 5-8; Donnelly Dep. at p.84, lines 4-7).

64.     Defendant Bourne agreed with Defendant Cancellieri's decision to terminate Plaintiff.  (Bourne Dep. at p.406, lines 10-12).

65.     Prior to Plaintiff's termination, Michael Levine ("Levine"), Plaintiff's immediate supervisor, was concerned about Plaintiff's attitude and Defendant Bourne was concerned about Plaintiff's attitude and job performance.   (Affidavit of Patricia Bourne in Opposition to Plaintiff's Motion for Preliminary Injunction dated January 22, 2004; Levine Dep. at p.79, lines 18-25, p.80, lines 2-6, p.81, lines 2-15, p.93, lines 2-23, p.107, lines 13-24, p.110, lines 5-25; Bourne Dep. at p.304, lines 3-25, p.305, lines 2-18, p.382, lines 11-14, p.386, lines 19-22).

66.     County employees must comply with the Nassau County Code of Ethics.  (Plain Language Guide to Government Ethics for Nassau County Officers and Employees).

67.     County employees may not use County equipment for a non-County purpose. (Plain Language Guide to Government Ethics for Nassau County Employees; Operations Directive, DCE/OPS No. 021-2003).

68.    By e-mail dated December 5, 2003, Defendant Cancellieri instructed Defendant Donnelly to effectuate the termination of Plaintiff.   (E-mail dated December 5, 2003, from Anthony Cancellieri to John Donnelly; Cancellieri Dep. at p.106, lines 2-16, p.108, lines 3-8; Donnelly Dep. at p.79, lines 3-25).

69.    On December 5, 2003, Defendant Donnelly told Defendant Bourne that he received a directive from Defendant Cancellieri to terminate Plaintiff because of the microphone incident the night before, and told her to begin the termination process.   (Donnelly Dep. at p.88, lines 21-25, p.89, lines 2-3, p.90, lines 16-25, p.108, lines 17-20; Bourne Dep. at p.400, lines 15-17, p.401, lines 5-20, p.405, lines 4-16).

70.    On December 5, 2003, Defendant Donnelly also contacted former Assistant Director of the Nassau County Office of Labor Relations Seth Weiss ("Weiss"), advised Weiss that Plaintiff was going to be terminated, and asked him to contact Defendant Bourne to ensure that the termination was effectuated properly.   (Donnelly Dep. at p.95, lines 5-11; Weiss Dep. at p.31, lines2-4).

71.    After speaking with Defendant Donnelly, Defendant Bourne drafted a termination letter.  (Bourne Dep. at p.411, lines 13-21, p.412, lines 7-17).

72.    On December 5, 2003, Plaintiff learned that she was being terminated. (Morgenstern Dep. at p.177, lines 7-9; Bourne Dep. at p.415, lines 2-10; Weiss Dep. at p.98, lines 5-8).

73.    After informing Plaintiff that she was terminated, Defendant Bourne told Plaintiff that she would assist her in packing up her belongings so that she could leave the building. (Morgenstern Dep. at p.177, line 21; Bourne Dep. at p.415, lines 5-10, p.418, lines 4-6).

74.     Weiss was present at the time Plaintiff was terminated.  (Weiss Dep. at p.8, lines 20-25, p.68, lines 13-15; Bourne Dep. at p.417, lines 7-16; Morgenstern Dep. at p.177, lines 2-3).

75.     Upon being terminated, Plaintiff went to the CSEA offices and met with Tim Corr ("Corr"), a CSEA union representative.  (Morgenstern Dep. at p.244, lines 10-19, p.245, lines 19-20).

76.     On the date of her termination, Plaintiff told Corr that Defendant Bourne had told her that she was becoming permanent sometime in mid-December and that her probationary period was going to end on December 16, 2003.  (Morgenstern Dep. at p.246, lines 15-25, p.247, lines 10-16; Corr Dep. at p.116, lines 18-25, p.117, lines 2-5, p.125, lines 18-25, p.126, lines 2-25, p.140, lines 24-25, p.194, lines 6-11).

77.     Corr told Plaintiff to gather her paperwork, create a log, and contact the CSEA after she had gathered her paperwork.  Corr then told Plaintiff that he would set up an appointment with the labor relations specialist at CSEA headquarters after she provided him with the information he requested.  (Morgenstern Dep. at p.249, lines 6-17; Corr Dep. at p.118, lines 22-25, p.119, lines 2-6, p.141, lines 14-21, p.247, lines 23-25, p.248, lines 2-25, p.249, lines 2-25, p.250, lines 2-4).

78.     Plaintiff never returned to the CSEA offices, nor did she provide Corr with the information he requested.  (Morgenstern Dep. at p.249, lines 17-18, p.252, lines 3-6, p.256, lines 23-25, p.257, lines 2-14; Corr Dep. at p.254, lines 6-25, p.255, lines 2-13).

79.     Plaintiff never filed a grievance challenging her termination.  (Morgenstern Dep. at p.254, lines 18-25, p.255, lines 2-25).

80.     Plaintiff contacted the attorneys who are representing her in the instant action on or about December 9, 2003.  (Morgenstern Dep. at p.256, lines 6-14).

81.     Plaintiff thought that one of the reasons she might have been terminated was because of the microphone incident in the Legislative Chamber on December 4, 2003. (Corr Dep. at p.117, lines 18-25, p.118, lines 2-9; Petersen Dep. at p.227, lines 2-225, p.228, lines 2-12).

**Facts Concerning Plaintiff's Allegations that the County Defendants'
Retaliated against Plaintiff in Violation of the *First Amendment***

82.     During her employment with the County, Plaintiff worked on several Planning Department projects, including an economic development initiative, an "open space" initiative, the transfer and redevelopment of the Grumman property, the master plan update, a "horse initiative," the building consolidation plan, and the Underhill property.  (Morgenstern Dep. at p.21, lines 24-25, p.22, lines 2-7, p.27, lines 16-25, p.28, lines 2-6, p.51, lines 12-23, p.53, lines 22-25, p.54, lines 2-4).

83.     Regarding the economic development initiative, Plaintiff was asked to research basic characteristics and problems within various Nassau County communities, and then to provide a profile of the economic development in those communities.  (Morgenstern Dep. at p.115, lines 9-14).

84.     During her employment with the County, Plaintiff raised concerns to Defendant Bourne and Levine about the economic development initiative.  Specifically, Plaintiff was concerned about irregularities in data collection (i.e., "wind chill surveys").  Once Plaintiff raised her concerns regarding data collection, the wind chill surveys were not conducted. (Morgenstern Dep. at p.115, lines 11-25, p.116, lines 2-25, p.117, lines 2-25, p.118, lines 2-8).

85.     Plaintiff also raised concerns to Defendant Bourne and Levine that economic development meetings were being used as a venue for politicking. The first of the economic development meetings took place in or about September 2002 and continued sporadically

14

throughout her employment with the County. (Morgenstern Dep. at p.112, lines 10-25, p.113, lines 2-6, p.118, lines 9-24; Second Amended Compl. at ¶ 32).

86.    Plaintiff never discussed her concerns regarding the economic development initiative with County Executive Suozzi. (Morgenstern Dep. at p.120, lines 7-9).

87.    Plaintiff considered it part of her job to raise concerns regarding the economic development initiative to her supervisors. (Morgenstern Dep. at p.120, lines 10-12).

88.    Defendant Bourne and Defendant Cancellieri did not have any conversations with regard to Plaintiff's complaints about the County or that it failed to comply with federal rules. (Cancellieri Dep. at p.71, lines 3-7; Bourne Dep. at p.467, lines 3-6).

89.    In the beginning of 2003, Plaintiff raised concerns to Defendant Bourne and Levine regarding two County employees' inappropriate use of County resources for political fundraising. Plaintiff also raised these concerns to Jane Houdek, counsel to the Nassau County Department of Public Works, who was a friend of Plaintiff's. (Morgenstern Dep. at p.120, lines 18-21, p.127, lines 13-25, p.128, lines 2-9, p.136, lines 14-17; p.150, lines 11-22; Second Amended Comp. at ¶¶ 32, 33; Bourne Dep. at p.462, lines 24-25, p.463, lines 2-18).

90.    Plaintiff did not raise her concerns regarding improper fundraising to County Executive Suozzi. (Morgenstern Dep. at p.128, lines 14-17).

91.    Defendant Bourne and Defendant Cancellieri did not have any conversations about Plaintiff's complaints about County resources and staff being used to support County Executive Suozzi's campaign for governor. (Cancellieri Dep. at p.70, lines 10-17; Bourne Dep. at p.467, lines 3-6).

92.    Defendant Cancellieri was never told about Plaintiff's concerns that County employees Katie Schwab and Kate Randolph were engaging in improper fundraising activities

15

while at work.  (Cancellieri Dep. at p.76, lines 15-25, p.77, lines 2-13; p.166, lines 19-25, p.167, lines 2-4).

93.     In the fall of 2002, Plaintiff raised concerns about requests for proposals and the lack of a formal solicitation process with regard to contracts for real estate consultation services. (Morgenstern Dep. at p.128, lines 18-25, p.129, lines 2-25, p.130, lines 2-10; p.151, lines 12-15; Second Amended Compl. at ¶ 32).

94.     Plaintiff raised her concerns about lack of a formal solicitation process to a committee that she served on to oversee the transfer of the Grumman property.  This committee consisted of both County employees and non-County-affiliated members.  (Morgenstern Dep. at p.129, lines 11-23, p.130, lines 11-15).

95.     Once Plaintiff raised her concerns to the committee, the committee, with the assistance of Plaintiff, developed a protocol for issuing requests for proposals.  (Morgenstern Dep. at p.130, lines 16-25, p.131, lines 2-25, p.132, lines 2-25, p.133, lines 2-20).

96.     Plaintiff considered it part of her job to raise concerns that there was no established request for proposal protocol. (Morgenstern Dep. at p.133, lines 21-15, p.134, line 2).

97.     Plaintiff did not raise her concerns about the request for proposal protocol with County Executive Suozzi or anyone else, aside from the members of the committee. (Morgenstern Dep. at p.134, lines 3-15).

98.     In July 2002, Plaintiff raised concerns about the County's compliance with environmental laws, in connection with the building consolidation plan.  (Morgenstern Dep. at p.134, lines 16-19; Second Amended Compl. at ¶ 32).

99.     Plaintiff raised her concerns regarding the County's compliance with environmental laws to a committee she served on which oversaw the development of the

16

consolidation plan, and which included the following County employees: Peter Gerbasi, former Commissioner of the Nassau County Department of Public Works, Carol Friedman, the head architect for the Department of Public Works, Shelly Cohen, former Director of the Nassau County Department of Real Estate Planning & Development, Seth Brown, who worked with Shelly Cohen, and Jane Houdek.  (Morgenstern Dep. at p.135, line 25, p.136, lines 2-25, p.137, lines 2-13).

100.    Plaintiff also raised her concerns to Defendant Bourne and Levine.  (Morgenstern Dep. at p.139, lines 12-16; Bourne Dep. at p.459, lines 15-25, p.460, lines 2-10).

101.    Plaintiff considered it part of her job to raise concerns about the County's compliance with environmental laws.  (Morgenstern Dep. at p.139, lines 23-25, p.140, lines 2-5).

102.    Plaintiff did not report her concerns about the County's compliance with environmental laws to anyone else.  (Morgenstern Dep. at p.140, lines 23-25, p.141, lines 2-6).

103.    Plaintiff did not raise her concerns about the County's compliance with environmental laws to County Executive Suozzi.  (Morgenstern Dep. at p.143, lines 22-25).

104.    Defendant Bourne and Defendant Cancellieri did not have any conversations about Plaintiff's complaints regarding the real estate consolidation project.  (Cancellieri Dep. at p.70, lines 18-22; Bourne Dep. at p.467, lines 3-6).

105.    Defendant Bourne and Defendant Cancellieri did not have any conversations about Plaintiff's complaints regarding misconduct committed by County officials and employees.  (Cancellieri Dep. at p.71, lines 8-12).

**FACTS RELATING TO**
**PLAINTIFF'S SECOND, THIRD AND FOURTH CAUSES OF ACTION**
**UNDER STATE LAW**

**Facts Concerning Plaintiff's Allegations**
**That the Union Defendant Breached Its Duty of Fair Representation**
**and the County Defendants Breached the Terms of the CBA**
**and Violated New York State Civil Service Law**

106.    The CBA between the Union Defendant and the County contains a five-step grievance procedure to resolve all claims in which a CSEA member alleges that the County has breached its obligations under the CBA (hereinafter referred to as the "Grievance Procedures"). (CSEA Agreement, County of Nassau at Sec. 23).

107.    The CBA requires that Plaintiff exhaust the Grievance Procedures before filing an action in any court related to the grievance.  (CSEA Agreement, County of Nassau at Sec. 23-2(d)).

108.    The CBA contains a section entitled "Disciplinary Procedures." (CSEA Agreement, County of Nassau at Sec. 10; Second Amended Compl. at ¶ 29).

109.    The Disciplinary Procedures detailed in Section 10 of the CBA are the exclusive disciplinary protections offered to all persons in the negotiating unit who have served a 26-week probationary period, and are in lieu of any and all other statutory or regulatory disciplinary protections.  (CSEA Agreement, County of Nassau at Sec. 10-1; Kampe Dep. at p.39, lines 15-24, p.74, 19-24, p.79, lines 7-10).

18

## FACTS RELATING TO PLAINTIFF'S FIFTH CAUSE OF ACTION
## UNDER STATE LAW

### Facts Concerning Plaintiff's Allegations that the County Defendants Defamed Plaintiff

110.    On December 6, 2003, an article written by Celeste Hadrick, entitled "3 Fired in Wake of Nassau Investigation," was published in *Newsday* ("Newsday Article").  (Newsday Article; Second Amended Compl. at ¶ 59).

111.    The Newsday Article concerned the resignation of former Deputy County Executive for Economic Development Peter Sylver ("Sylver"), who was accused of misusing federal funds during his employment with the County.  (Newsday Article).

112.    Plaintiff sought and received Celeste Hadrick's telephone number before she left the Planning Department on the date of her termination.  (Morgenstern Dep. at p.196, lines 9-12).

113.    Plaintiff spoke to Celeste Hadrick and was one of the sources for information for the Newsday Article. (Morgenstern Dep. at p.193, lines 21-23, p.194, lines 2-8).

114.    The second paragraph of the article states: "Deputy County Executive Anthony Cancellieri said he was following orders from County Executive Thomas Suozzi to clean up the economic development department and get rid of the 'dead wood,' including one employee who hasn't been in the office for months but has remained on the payroll."  (Newsday Article).

115.    The fifth paragraph of the Newsday Article states: "One of the employees fired Friday from the planning commission, an economic development agency, complained Friday that Suozzi had siphoned money meant to develop a legally required county master plan to pay for 'dog-and-pony' show community meetings while ordering employees not to talk about department operations." (Newsday Article).

116.    The sixth paragraph of the Newsday Article states: "'I think I was fired because I am a liability to Tom Suozzi,' said Georgi Morgenstern, who said she has a master's degree in

urban planning and is a certified planner.  'They said I was not a team player'."  (Newsday Article).

117.    The seventh paragraph of the Newsday Article states: "'It's all about smoke and mirrors here,' she said.  'There is no substance to anything'."  (Newsday Article).

118.    The eighth paragraph of the Newsday Article states: "Cancellieri, however, said Morgenstern was still on probation when she was terminated and that he couldn't say anything more than she 'failed to live up to the standards of Nassau County.'  He declined to comment on her allegations."  (Newsday Article).

119.    The ninth, tenth, and final paragraphs of the Newsday Article refer to two County employees who had not shown up for work.  (Newsday Article).

120.    Although Defendant Cancellieri spoke with Celeste Hadrick before the Newsday Article was published, Defendant Cancellieri did not contact her.  (Cancellieri Dep. at p.148, lines 2-21, p.149, lines 7-15).

121.    Defendant Cancellieri did not consider Plaintiff to be one of the employees who was not coming to work, as referenced in the Newsday Article.  (Cancellieri Dep. at p.151, lines 24-25, p.152, lines 2-6).

122.    When Defendant Cancellieri referred to "dead wood" in the Newsday Article he meant "people not coming to work."  (Cancellieri Dep. at p.153, lines 6-7).

123.    Defendant Cancellieri was not referring to Plaintiff when he referred to "dead wood" in the Newsday Article because he did not consider her to be dead wood.  (Cancellieri Dep. at p.153, lines 8-15).

124.     When Defendant Cancellieri said Plaintiff failed to live up to the standards of Nassau County, he did so as a means of explaining why an employee would be terminated during a probationary period.  (Cancellieri Dep. at p.156, lines 5-14).

125.     When Defendant Cancellieri said Plaintiff failed to live up to the standards of Nassau County, he was referring to County standards regarding an employee's conduct. (Cancellieri Dep. at p.156, lines 15-20).

126.     Defendant Cancellieri spoke to Celeste Hadrick because Plaintiff had gone to the newspaper and given her side of the story, and he wanted to give the other side of the story and set the record straight.  (Cancellieri Dep. at p.158, lines 8-12, p.159, lines 7-23).

127.     Neither County Executive Suozzi, Defendant Donnelly nor Defendant Bourne is quoted in the Newsday Article.  (Newsday Article).

128.     On December 21, 2003, an article written by Bruce Lambert, entitled "Suozzi Faces His First Political Scandal," was published in *The New York Times* (hereinafter referred to as the "New York Times Article"). (New York Times Article; Second Amended Compl. at ¶ 60).

129.     The New York Times Article concerned Sylver's resignation upon disclosure of irregularities committed by him, including questionable credit card purchases on the accounts of federal community development grants, as well as his failure to keep attendance records of his staff.   The New York Times Article also reported on the County's response to these irregularities.  (New York Times Article).

130.     The third paragraph of the New York Times Article states: "But in late November [Suozzi's] deputy for economic development, Peter Sylver, was forced to resign after a string of embarrassing disclosures and the firing of three Sylver aides, some of whom had been no-shows for months."  (New York Times Article).

131.   The third paragraph in the New York Times Article is not attributed to any source.  (New York Times Article).

132.   Plaintiff's name is not mentioned anywhere in the New York Times Article. (New York Times Article).

133.   Neither Defendant Cancellieri, Defendant Bourne, nor Defendant Donnelly is quoted in the New York Times Article.  (New York Times Article).

134.   Plaintiff served on the board of the North Shore Land Alliance, a non-governmental land conservation organization, in the spring of 2003.  (Morgenstern Dep. at p.188, lines 2-7, p.190, lines 4-6; Second Amended Compl. at ¶ 66).

135.   The benefit that Plaintiff received from serving as a board member of the North Shore Land Alliance was the satisfaction of knowing that she was helping people to preserve land.  (Morgenstern Dep. at p.190, lines 7-14).

136.   Plaintiff received no compensation for her service as a board member of the North Shore Land Alliance.  (Second Amended Compl. at ¶ 66).

137.   Plaintiff contacted Lisa Ott ("Ott"), the Executive Director of the North Shore Land Alliance, shortly after her termination to tell her that she had been terminated.  During that conversation, Ott told Plaintiff that she would remain as a board member.  (Morgenstern Dep. at p.190, lines 19-24; Second Amended Compl. at ¶ 68).

138.   On January 14, 2003, less than one-week after Plaintiff filed the instant action, Plaintiff received a phone call from Ott, wherein Ott asked Plaintiff to step down as a board member but to continue to advise the North Shore Land Alliance on an as-needed basis. (Morgenstern Dep. at p.191, lines 4-11; Second Amended Compl. at ¶ 67).

139.    Upon asking Plaintiff to step down, Ott told Ms. Morgenstern that the organization wanted to remain outside the political arena and that the board of trustees did not want to "get political."  (Morgenstern Dep. at p.191, lines 12-18; Second Amended Compl. at ¶ 67).

140.    After her termination, and after Plaintiff filed the instant action, Plaintiff was approached by reporters from the *Long Island Press* and the *New York Law Journal*. (Morgenstern Dep. at p.197, lines 19-25, p.198, lines 2-6).

141.    Plaintiff chose to speak to the reporter from the *Long Island Press* because she wanted to tell her side of the story.  (Morgenstern Dep. at p.198, lines 18-25, p.199, lines 2-19).

142.    On May 26, 2005, an article written by Christopher Twarowski, entitled "The Whistleblower," was published by the *Long Island Press* (hereinafter referred to as the "Long Island Press Article").  (Long Island Press Article).

143.    Photographs of Plaintiff appeared in the Long Island Press Article.  (Long Island Press Article; Morgenstern Dep. at p.199, lines 20-25).

144.    Photographs of Plaintiff did not appear in the Newsday Article or the New York Times Article.  (Newsday Article; New York Times Article; Morgenstern Dep. at p.200, lines 9-18).

145.    Plaintiff also discussed her termination over a blog on the internet called "The Schwartz Report."  (Morgenstern Dep. at p.200, lines 19-25, p.201, lines 2-19; The Schwartz Report Conversation Strings dated July 16, 17, 18, and 19, 2004).

146.    Plaintiff used the user name "Disillusioned" when posting blogs on The Schwartz Report.  On a posting dated July 18, 2004, 7:40 a.m., Plaintiff included her initials at the end of her commentary.  (The Schwartz Report Conversation Strings dated July 16, 17, and 18, 2004).

## FACTS RELATED TO PLAINTIFF'S SIXTH CAUSE OF ACTION
## UNDER NEW YORK EXECUTIVE LAW § 296

**Facts Concerning Plaintiff's Allegations that the County Defendants Wrongfully
Terminated Plaintiff in Retaliation for Filing an EEO Complaint**

147.    On or about September 9, 2003, Plaintiff received the Nassau County Equal
Employment Opportunity Policy.  (Memorandum from Dean Bennett to All Nassau County
Employees dated August 2003).

148.    On or about September 19, 2003, Plaintiff filed a charge of sexual harassment
against, Mark Buttice ("Buttice"), an employee of the Planning Department.  (Nassau County
EEO Complaint Form dated September 19, 2003; Morgenstern Dep. at p.95, lines 7-9).

149.    In her EEO complaint, Plaintiff alleged one incident in which Buttice "berated me
in an unprofessional and uncivilized manner in front of other colleagues and management staff at
a meeting he called."  (Nassau County EEO Complaint form dated September 19, 2003).

150.    Defendant Bourne reprimanded Buttice for his conduct at the staff meeting.
(Morgenstern Dep. at p.94, lines 9-25, p.95 lines 2-6).

151.    Plaintiff filed the EEO complaint because she wanted Buttice to get anger
management help.  (Morgenstern Dep. at p.95, lines 10-15; Bourne Dep. at p.476, lines 17-25,
p.477, lines 2-25, p.478, lines 2-17).

152.    At Plaintiff's request, a meeting was held with Plaintiff, Sylver, Defendant
Donnelly, Nassau County's former Director of Nassau County EEO Dean Bennett, and EEO
representative, Michelle Marquez, to discuss Plaintiff's EEO issues. (Donnelly Dep. at p.44,
lines 12-25, p.45, lines 2-16, p.46, lines 2-13, p.49, lines 8-13).

153. Given the nature of Plaintiff's complaint regarding Buttice, it was determined at the meeting that the matter was a management issue, not an EEO issue. (Donnelly Dep. at p.47, lines 12-25, p.48, lines 2-24, p.49, lines 2-24, p.53, lines 7-15, p.55, lines 11-21).

154. The conflict between Plaintiff and Buttice was resolved by limiting the interaction between them. (Bourne Dep. at p.327, lines 6-25, p.328, lines 2-25, p.329, lines 2-25, p.330, lines 2-25, p.331, lines 2-6; Donnelly Dep. at p.50, lines 18-24).

155. At the time of Plaintiff's termination, Defendant Donnelly was not aware that Plaintiff formally filed an EEO complaint. (Donnelly Dep. at p.236, lines 3-25).

156. Defendant Donnelly never spoke to Defendant Cancellieri about Plaintiff's EEO complaint. (Cancellieri Dep. at p.192, lines 14-16)

157. At the time of Plaintiff's termination, Defendant Cancellieri did not know that Plaintiff filed the EEO complaint. (Cancellieri Dep. at p.192, lines 7-16).

158. In December 2003, the EEO Director, Dean Bennett, issued a recommendation and finding that Plaintiff's complaint of sexual harassment or hostile work environment did not violate the County's EEO policy. (Memorandum from Dean E. Benett to Nassau County Department of Economic Development dated December 2003).

Dated: Mineola, New York
October 2, 2007

<div style="margin-left:40%">

LORNA B. GOODMAN
Nassau County Attorney

By: _____/s/_____
Erica M. Haber (EH 1122)
Esther D. Miller (EM 2416)
Deputy County Attorneys
Office of the Nassau County Attorney
One West Street
Mineola, New York 11501
(516) 571-6074
Attorneys for County Defendants

</div>

To:    Jihee G. Suh, Esq.
        Thompson Wigdor & Gilly, LLP
        350 Fifth Avenue, Suite 5720
        New York, New York 10118
        Attorneys for Plaintiff
        (*via ECF and first class mail*)

        Steven A. Crain, Esq.
        Amelia K. Tuminaro, Esq.
        Civil Service Employees Association, Inc.
        Box 7125, Capitol Station
        143 Washington Avenue
        Albany, New York 12224
        Attorneys for the Union Defendant
        (*via ECF and first class mail*)