UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
GEORGINA MORGENSTERN,

        Plaintiff,

     -against-          <u>MEMORANDUM AND ORDER</u>
                          04-CV-0058(JS)(ARL)
COUNTY OF NASSAU, THOMAS R. SUOZZI,
ANTHONY M. CANCELLIERI, PATRICIA
BOURNE, and JOHN P. DONNELLY,

        Defendants.
-----------------------------------X

APPEARANCES:
For Plaintiff:     Scott Browning Gilly, Esq.
                Douglas Holden Wigdor, Esq.
                Kenneth P. Thompson, Esq.
                Jihee Gillian Suh, Esq.
                Thompson, Wigdor & Gilly LLP
                350 Fifth Avenue, Suite 5720
                New York, New York 10118

For Defendants:    Esther D. Miller, Esq.
                Joanne L. Oweis, Esq
                Bethany Bresnaider O'Neill, Esq
                Erica Michelle Haber, Esq
                Nassau County Attorney's Office
                One West Street
                Mineola, New York 11501

SEYBERT, District Judge:

       Plaintiff Georgina Morgenstern filed a Complaint on January 8, 2004 alleging that the County of Nassau ("County"), Thomas R. Suozzi ("Suozzi"), Anthony M. Cancellieri ("Cancellieri"), Patricia Bourne ("Bourne"), and John P. Donnelly ("Donnelly") (the "Individual Defendants") (collectively, the "Defendants") violated Plaintiff's right to due process and freedom of speech, breached their employment contract with Plaintiff, violated the New York Civil Service Law, defamed Plaintiff, and

retaliated against Plaintiff for complaining of sexual harassment in the workplace. Pending before the Court is Defendants' motion for summary judgment and Plaintiff's motion to strike the affidavits of Lorna Goodman, Donald Hohn, and Edward Mellina. For the reasons stated below, the Court GRANTS Defendants' motion for summary judgment in part and DENIES it in part, DENIES Plaintiff's motion to strike Goodman and Hohn's Affidavit, and GRANTS Plaintiff's motion to strike Mellina's Affidavit.

I. Motion To Strike Affidavits

Defendants submit the affidavits of Lorna Goodman, Donald Hohn, and Edward Mellina in support of their Rule 56.1 Statement of Material Facts. Plaintiff moves to strike the affidavits on the ground that Defendants did not disclose these three affiants pursuant to Federal Rule of Civil Procedure 26(a) as persons with knowledge of the claims and defenses in this case. Because Defendants rely on the affidavits in support of their motion for summary judgment, the Court addresses Plaintiff's motion to strike as a preliminary matter.

A. Standard Of Review

Federal Rule of Civil Procedure 37(c)(1) states, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless." The

purpose of Rule 37(c)(1) "is to prevent the practice of 'sandbagging' an adversary with new evidence." <u>Ventra v. United States</u>, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000) (<u>citing</u> <u>Johnson Electric North America v. Mabuchi Motor America Corp</u>., 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999)). However, it is well recognized that "preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution." <u>Ebewo v. Martinez</u>, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).

    1.   <u>The Goodman Declaration</u>

In her Affidavit, Goodman testifies as to what she heard Plaintiff say through the speakers located in Goodman's office.[1] Goodman further testifies that she saw Plaintiff speaking into a microphone at the County Legislative Chambers, and told Plaintiff to stop speaking because the microphones were live and Plaintiff's words were being broadcast throughout the building. Defendants submit the affidavits to corroborate their statements that Plaintiff made disparaging comments about the County and County Executive on December 4, 2003, that were broadcast throughout the building.

Upon review of the Goodman Declaration, the Court finds that Defendants' failure to disclose Goodman as a witness was harmless. Plaintiff was well aware of Goodman's role in this

---

[1] This incident is discussed in greater detail in the "Background" portion of this Order.

3

lawsuit, as Plaintiff herself testified that Goodman came into the Legislative Chambers and told Plaintiff that the speakers were on and to turn them off. (Pl.'s Dep. p. 164-170.) Plaintiff further stated in her Rule 56.1 Counter-statement that she speculated around the time of her termination that one of the reasons for the termination was Goodman's remarks to Plaintiff on December 4, 2003 regarding the microphone incident. (Pl.'s 56.1 Stmt. ¶ 81.) Moreover, Plaintiff served a document request on Defendants seeking all documents to, from, or by Goodman "reflecting Ms. Goodman's communications concerning Plaintiff's alleged conduct on December 4, 2003 . . . and/or the alleged comments that Plaintiff made on the microphone." (Haber Dec. Ex. H.)

Clearly Plaintiff was well aware of Goodman's personal knowledge of the facts of this case, and should have been on notice that Goodman was a potential witness. The Court further finds Defendants' decision to utilize Goodman's Affidavit justified in light of Plaintiff's denials of Defendants' version of the facts. Plaintiff was aware that Goodman heard Plaintiff's comments over the speakers, and therefore should have been aware that Defendants would use Goodman as a witness to corroborate their version of Plaintiff's alleged disparaging comments. See Lore v. City of Syracuse, No. 5:00-CV-1833, 2005 U.S. Dist. LEXIS 30328, at *5-6 (N.D.N.Y Nov. 17, 2005) (finding that preclusion of witnesses was unwarranted because although the "plaintiff failed to adhere to the

4

letter of the discovery rules, . . . [the] defendants were sufficiently aware of the existence and relevance of the persons in question so that defendants are not being subjected to trial by ambush.").

The Court also rejects Plaintiff's argument that Goodman's Affidavit violates Rule 5-102(c) of the New York Code of Professional Responsibility. Rule 5-102(c) states,

> "A lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client . . . . .

The rule provides for certain exceptions under which a lawyer may act as an advocate and also testify, which include situations where the "testimony will relate solely to an uncontested issue" and where "disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as a counsel in the particular case." Rule 5-102(c) of the New York Code of Professional Responsibility.

Here, Defendants argue that Goodman's testimony relates solely to uncontested issues. The Court disagrees. Plaintiff disputes making disparaging comments about the County and the County Attorney, and Goodman's Affidavit directly relates to this disputed fact. Nonetheless, the Court finds that Goodman's

affidavit does not violate Rule 5-102(c).  Goodman has not been
named as the attorney for Defendants in this case; all of the
attorneys named thus far for Defendants have been Assistant County
Attorneys.  Rule 5-102(c) is not violated where assistant county
attorneys serve as advocates in a case where a County Attorney has
become a witness.   See Knapp v. County of Livingston, 667 N.Y.S.2d
662, 664 (4th Dep't 1997) (acknowledging that the County Attorney
had been substituted as trial counsel during the course of the
trial by his assistant because the County attorney had become a
witness); Ellis v. County of Broome, 103 A.D.2d 861 (3d Dep't 1984)
(affirming disqualification of County Attorney but reversing
disqualification of entire County Attorney's Office because
"permitting another member of the County Attorney's staff to
litigate the case" obviated the problems foreseen by Rule 5-102(c);
see also People v. McCoy, 302 A.D.2d 797 (3d Dep't 2003) ("It is
now well established that, absent a showing of an actual conflict
of interest, the advocate-witness rule . . . does not contemplate
disqualification of an entire District Attorney's office merely
because one of the assistants will be called to testify concerning
a material fact issue.") (internal citations omitted).[2]

Accordingly, the Court DENIES Plaintiff's motion to

---

[2] This decision is without prejudice to Plaintiff making a
motion pursuant to Rule 5-102(c) in the event that this case
proceeds to trial and Defendants utilize Goodman as trial
counsel.

strike Goodman's Affidavit.

### 2. The Hohn Affidavit

The Court similarly finds that Plaintiff would not be "sandbagged" by Hohn's affidavit. The parties' submissions indicate that Hohn played a substantial role during discovery; Defendants submitted voluminous documents regarding Hohn's probationary period and employment. Moreover, Plaintiff was aware that Hohn was present during the December 4th incident, and in fact listed Hohn as a potential witness in Plaintiff's initial disclosures. Finally, Hohn was also listed on Defendants' Proposed Joint Pre-trial Order as a trial witness. Although Defendants should have complied more diligently with the discovery rules, Defendants' failure to disclose Hohn does not warrant the severe sanction of striking Hohn's testimony because Plaintiff was well aware of Hohn's identity and the scope of his knowledge. See Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A., No. 01-CV-1047, 2002 U.S. Dist. LEXIS 17502, at *6 (S.D.N.Y. Sept. 19, 2002) ("[A] failure to disclose witness information is 'harmless' if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial.") (quoting 6 Moore's Federal Practice § 26.27[2][d] at p. 26-93).

### 3. The Mellina Affidavit

Defendants offer Mellina's affidavit to show that the audio system was designed to broadcast statements made during

Legislative meetings or sessions in the Legislative Chamber.
Defendants argue that they were compelled to locate a witness with
personal knowledge of the audio system only after Plaintiff stated
in her 56.1 Statement that "there is no evidence that when turned
on, the microphones in the Legislative Chamber are in fact designed
to broadcast throughout all of the executive offices at One West
Street." (Pl.'s 56.1 Stmt. ¶ 59). However, the Court finds this
argument to be without merit.

Given the record before the Court, it does not appear
that Plaintiff would have been on notice of the potential use of
Mellina as a witness. On August 1, 2007, Plaintiff inspected the
Legislative Chambers, and the rooms adjacent to the chambers in
connection with this litigation. (See Vallas Aff. ¶ 2.) At this
point, Defendants should have been aware that Plaintiff might make
an argument regarding the functioning of the speakers, particularly
given the importance of the incident in this case. Even if
Defendants were not aware of Plaintiff's argument, Defendants had
ample opportunity to supplement their disclosure, as Plaintiff
filed her 56.1 Counter-statement on October 18, 2007. Mellina's
Affidavit was not filed until January 18, 2008. Unlike Goodman and
Hahn, Plaintiff could not have been on notice of Mellina's
affidavit because its unlikely that Plaintiff even knew of
Mellina's existence.

Although Mellina was present, along with counsel for

Defendants, when Plaintiff inspected the Legislative Chambers, Defendants did not introduce Mellina to Plaintiff. (Id. ¶ 4.) Absent disclosure, the Court does not see how Plaintiff could have anticipated the use of the Procurement Supervisor's affidavit, a person whose identity Plaintiff may not even have been aware of, and who did not play any role in the parties' discovery process. The Court finds that Plaintiff would be prejudiced by Mellina's affidavit, and Defendants have not proffered a legitimate excuse for their failure to disclose, and accordingly GRANTS Plaintiff's motion to strike Mellina's Affidavit.

## II. Defendants' Motion For Summary Judgement

### A. Background

The following facts are taken from the Parties' 56.1 Statement, Counter-Statement and the exhibits thereto. Although the Parties agree on very little, the following facts are undisputed unless otherwise noted.

The County is a municipal corporation duly organized and existing pursuant to the law of the State of New York. (Defs.' 56.1 Stmt. ¶ 1.) Defendant Suozzi is the County Executive of the County of Nassau, and has been the County Executive at all relevant times. (Id. ¶ 2.) Defendant Cancellieri was the Deputy County Executive for Public Safety at the time of Plaintiff's hire, and became the Chief Deputy County Executive of the County by the time of Plaintiff's termination. (Id. ¶ 3; Pl.'s 56.1 Stmt. ¶ 3.) As

Chief Deputy County Executive, Cancellieri had the authority to hire and terminate County employees. (Defs.' 56.1 Stmt. ¶ 8.) Defendant Bourne is the Executive Commissioner of the Nassau County Planning Commission, and also has the authority to hire and terminate employees. (Id. ¶¶ 9, 14; Pl.'s 56.1 Stmt. ¶ 14.)

In October of 2002, Defendant Donnelly was hired as the Director of the Department of Human Resources; he has since become the Chief Deputy County Executive. (Defs.' 56.1 Stmt. ¶¶ 15, 16.) The parties dispute whether Donnelly had the power to hire and fire employees as the Director of the Department of Human Resources.

On August 13, 2002, the County hired Plaintiff as a provisional employee in the position of Planner III with the Department of Planning (hereinafter, the "Planning Department"). (Id. ¶ 22.) On October 22, 2002, the County notified Plaintiff that she was subject to filing for the first available competitive examination for the Planner III position, and on November 16, 2002, Plaintiff sat for this competitive examination. (Id. ¶¶ 23, 24.) The County notified Plaintiff on or about April 28, 2003 that her name had been placed on the eligibility list for the Planner III position. (Id. ¶ 26.) Plaintiff was appointed from the eligible list on June 16, 2003 to the competitive civil service Planner III position at a salary of $64,176. (Id. ¶ 28.)

At the time of her appointment, the County informed Plaintiff that it was placing her on a probationary period. (Id.

¶ 29.) The "Appointment From An Eligible List" form given to Plaintiff has the phrase "24 (twenty-four) weeks" written in the line titled "Maximum probationary term." (Erica M. Haber Dec. Ex W.) Defendant argues that the 24-week probationary term was a clerical error. Plaintiff hotly disputes that such a clerical error occurred.

Rule XIX of the Nassau County Civil Service Commission Civil Service Rules states that "every permanent appointment from an open competitive list . . . shall be for a specific probationary term of not less than eight nor more than twenty-six weeks except as herein otherwise provided." (Erica M. Haber Dec. Ex AA.). The parties dispute whether an additional trial period is required after an employee completes the probationary period, and dispute whether employees are entitled to disciplinary protection during their probation periods.

Plaintiff's probationary period began on June 16, 2003. (Defs.' 56.1 Stmt. ¶ 39.) Defendants argue that Bourne informed Plaintiff that her probationary period would end on December 16, 2003; Plaintiff maintains that although Bourne made this statement, it was made in reference to an incorrect six-month probationary period that Plaintiff argues was not applicable to her. (Id. ¶ 41; Pl.'s 56.1 Stmt. ¶ 41.)

Plaintiff took three sick days and eight and one-half vacation days during her probationary period. (Defs.' 56.1 Stmt.

11

¶ 49.). Defendant argues, and Plaintiff disputes, that if an employee misses more than ten work days, her probationary term shall be extended by the number of days absent.

As part of one of the projects Plaintiff was asked to work on during her employment, Plaintiff had to research problems within Nassau County communities and provide an economic profile of those communities (the "Economic Development Initiative"). (Id. ¶ 83.) Plaintiff raised several concerns about the Economic Development Initiative with other employees, including Bourne, such as her concern that the meetings related to the initiative were being used for politicking. (Id. ¶¶ 84; Pl.'s 56.1 Stmt. ¶¶ 84.)

At some point during her employment, Plaintiff raised her concern to several individuals, including Bourne, Michael Levine ("Levine"), Plaintiff's immediate supervisor, and Jane Houdek ("Houdek"), Counsel to the County Department of Public Works, that County employees were improperly using County resources for political fund-raising (Id. ¶ 89; Pl.'s 56.1 Stmt. ¶ 89.) In the fall of 2002, Plaintiff voiced her concerns regarding requests for proposals and the lack of a formal solicitation process for work performed for Nassau County. (Defs.' 56.1 Stmt. ¶ 93) Plaintiff raised this issue to a committee that she served on to oversee the transfer and development of certain property located in the County, known as the Grumman property. (Id. ¶ 94.) In response, the committee developed a protocol for issuing requests for proposals.

(Id. ¶ 95.) During her employment, Plaintiff also voiced her concerns regarding the County's compliance with environmental laws. (Id. ¶ 98.) Plaintiff did not raise any of the aforementioned concerns to Suozzi. (Defs.' 56.1 Stmt. ¶¶ 86, 90, 103.)

During her employment, Plaintiff worked on an update to the Nassau County Master Plan, and was asked to present the update during the Nassau County Planning Commission's last meeting of the year. (Defs.' 56.1 Stmt. ¶¶ 52, 53.). The meeting was held on December 4, 2003, in the caucus room of the County's Legislative Chambers. (Id. ¶ 54.) Prior to the meeting, Plaintiff and other Planning Department Staff waited in the Legislative Chamber while the Planning Commission members discussed issues in the caucus room. (Id. ¶ 55.) The facts concerning what occurred while Plaintiff waited in the Legislative Chamber are greatly disputed (hereinafter referred to as the "December 4 microphone incident"). Defendant's version of the facts are as follows: While waiting in the Legislative Chamber, Plaintiff sat on the chair of the Presiding Officer of the Legislature and simulated a Legislative Session. Plaintiff pretended to be the Presiding Officer, and spoke into the microphone attached to the Presiding Officer's seat, which was turned on at the time. Plaintiff thereupon made disparaging comments about the County and County Executive Suozzi, which were broadcast throughout the executive offices, located at One West Street, Mineola, New York ("One West").

Plaintiff argues that the microphone had been turned on unbeknownst to Plaintiff, and that there is no evidence that the microphones are designed to broadcast throughout One West. Plaintiff denies making disparaging comments about the County or Suozzi.

Defendant maintains that Cancellieri made the decision to terminate Plaintiff after hearing of the December 4 microphone incident, whereas Plaintiff argues that Defendants terminated her in retaliation for Plaintiff's voiced concerns about allegedly improper conduct by County officials. The parties also greatly dispute Plaintiff's job performance and Plaintiff's attitude during her employment.

Plaintiff's employment was terminated on December 5, 2003. (Defs.' 56.1 Stmt. ¶¶ 31, 72.) After her termination, Plaintiff met with Tim Corr ("Corr"), a Civil Service Employees Association, Inc. ("CSEA") union representative. (Id. ¶ 75.) Plaintiff informed Corr that Bourne had told Plaintiff that Plaintiff's probationary period would end on December 16, 2003. (Id. ¶ 76.) The parties dispute whether Corr told Plaintiff to gather paperwork and contact the CSEA after she acquired the relevant documentation. Plaintiff did not return to the CSEA office. (Id. ¶ 78.) Plaintiff argues that she attempted to file a grievance but was denied such an opportunity; Defendants maintain that Plaintiff simply did not follow up with Corr and never filed

a grievance.   The parties dispute the disciplinary protections afforded to Plaintiff during her probationary period, and dispute whether Plaintiff was required to exhaust grievance procedures.

On December 6, 2003, Newsday published an article, entitled "3 Fired in Wake of Nassau Investigation" (the "Newsday Article"). (Defs.' 56.1 Stmt. ¶ 110.)   The Newsday Article discussed  the resignation of former deputy County Executive for Economic Development Peter Sylver ("Sylver"), who had been accused of misusing County funds.  (Defs.' 56.1 Stmt. ¶¶ 111-112.)   The second paragraph of the Newsday Article states, "Deputy County Executive Anthony Cancellieri said he was following orders from County Executive Thomas Suozzi to clean up the economic development department and get rid of the 'dead wood,' including one employee who hasn't been in the office for months but has remained on the payroll."  (Id. ¶ 114.)   The fifth paragraph states, "One of the employees fired Friday from the planning commission, an economic development agency, complained Friday that Suozzi had siphoned money meant to develop a legally required county master plan, to pay for 'dog-and-pony show' community meetings while ordering employees not to talk about department operations."  (Id. ¶ 115.)

The sixth paragraph quotes Plaintiff, who was one of the sources of information for the article.  (Id. ¶¶ 113, 116.)   The Newsday Article states,  "'I think I was fired because I am a liability to Tom Suozzi,' said Georgi Morgenstern, who said she has

a master's degree in urban planning and is a certified planner. 'They said I was not a team player.'" (Id. ¶ 116.). The eighth paragraph states, "Cancellieri, however, said Morgenstern was still on probation when she was terminated and that he couldn't say anything more than she 'failed to live up to the standard of Nassau County.' He declined to comment on her allegations." (Id. ¶ 118.).

On December 21, 2003, the New York Times published "Suozzi Faces His First Political Scandal," an article written by Bruce Lambert ("The N.Y. Times Article"). (Id. ¶ 128.). The Third paragraph of the N.Y. Times Article states, "But in late November [Suozzi's] deputy for economic development, Peter Sylver, was forced to resign after a string of embarrassing disclosures and the firing of three Sylver aides, some of whom had been no-shows for months." (Id. ¶ 130.) Plaintiff's name is not mentioned in the N.Y. Times Article. (Id. ¶ 132.)

After her termination, reporters from the Long Island Press and the New York Law Journal approached Plaintiff. The Long Island Press published an article entitled "The Whistleblower" (The Long Island Press Article), which discussed Plaintiff's story and published a photograph of Plaintiff. (Id. ¶¶ 141-143.) Plaintiff also discussed her termination on an internet blog, "The Schwartz Report." (Id. ¶ 145.)

I.    Standard Of Review On Summary Judgment

"Summary judgment is appropriate where there is no genuine dispute concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998)(citing Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'"

Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Indeed, when a motion for summary judgment is made, it is time to "to put up or shut up. . . . [U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41 (internal citations omitted). It is within this framework that the Court addresses the present summary judgment motion.[3]

## II. Section 1983

"Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the

_____

[3] The Court notes that Plaintiff has made a cursory argument on the last page of her opposition papers that summary judgment should be denied because of Defendants' spoilation of key e-mails. The Court rejects this argument. The destruction evidence is a serious claim, and can result in sanctions such as denial of a summary judgment motion. See Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93 (2d Cir. Conn. 2001). Nonetheless, the Court finds that Plaintiff has failed to meet her burden of showing that a spoilation occurred. Plaintiff does not allege who wrote or sent the e-mails, what the e-mails were about, and why they are relevant to Plaintiff's case. Plaintiff's four sentence argument that Defendants deleted key e-mails, without more, is insufficient to show spoilation. It is entirely unclear that any relevant e-mails were destroyed, and therefore the Court cannot deny summary judgment based on spoilation. See Alaimo v. TWA, Inc., No. 00-CV-3906, 2005 U.S. Dist. LEXIS 1530, at *9 (S.D.N.Y. Feb. 1, 2005) ("Since plaintiff has not establish[ed] that the records and documents she sought ever existed, there can be no finding of spoilation of evidence.").

Constitution or federal law." <u>Blyden v. Mancusi</u>, 186 F.3d 252, 264 (2d Cir. 1999). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (citing <u>Parratt v. Taylor</u>, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981)). Section 1983 does not create a substantive right; rather, to recover, a plaintiff must establish the deprivation of a separate, federal right. <u>See</u> <u>Thomas v. Roach</u>, 165 F.3d 137, 142 (2d Cir. 1999). Here, "there is no issue as to whether the challenged conduct was perpetrated by officials acting under the color of state law." <u>Wallace v. Suffolk County Police Dep't</u>, 396 F. Supp. 2d 251, 257 (E.D.N.Y. 2005). The only issue, therefore, is whether Plaintiff's constitutional rights have been violated.

Plaintiff alleges that Defendants violated Section 1983 by depriving Plaintiff of her First Amendment right of free speech and her Fourteenth Amendment right to procedural due process.

A.   <u>Fourteenth Amendment Claim</u>

Plaintiff argues that she was a permanent civil service employee, and therefore was entitled to a notice and hearing prior to her termination. Defendants argue that they are entitled to summary judgment on Plaintiff's procedural due process claim

because Plaintiff was still on probation at the time of her termination, and as such was not entitled to a hearing.

"Under New York law, 'it is well settled that a probationary employee, unlike a permanent employee, has no property rights in his position and may be lawfully discharged without a hearing and without any stated specific reason.'" <u>Finley v. Giacobbe</u>, 79 F.3d 1285, 1297 (2d Cir. N.Y. 1996) (<u>quoting</u> <u>Meyers v. City of New York</u>, 622 N.Y.S.2d 529, 532 (2nd Dep't 1995)). Therefore, if Plaintiff was a probationary employee at the time of her termination, she would not have been entitled to a hearing. However, if Plaintiff attained permanent status during her employment, Defendants were required to hold a hearing propr to terminating Plaintiff. <u>See</u> N.Y. Civ. Serv. Law § 75 ("A person holding a position by permanent appointment in the competitive class of the classified civil service" shall not be terminated "except for incompetency or misconduct shown after a hearing . . . .").

### 1. <u>Defendants' Alleged Clerical Error</u>

Rule XIX(1)(a) of the Nassau County Civil Service Rules (the "Rules") states that every permanent appointment from an open competitive list "shall be for a specific probationary term of not less than eight nor more than twenty-six weeks except herein otherwise provided." The parties do not dispute that Plaintiff's Civil Service Form and Change of Status Form list a twenty-four

week probationary period.   However, Defendants argue that the twenty-four week period listed was clearly a clerical error because the Collective Bargaining Agreement ("CBA") governing the terms of Plaintiff's employment mandated a twenty-six week period.

The pertinent section of the CBA states, "There shall be a trial period of twenty-six (26) weeks  for all employees in full-time positions, unless a longer, or new, or additional probationary or trainee period is provided by the Civil Service Commission Rules or the New York State Statute." (CBA § 10-1.1.)  Plaintiff argues that the term "new" in the CBA allows the twenty-four week period provided in Plaintiff's civil service form, which complies with the eight to twenty-six week probationary period referenced in Rule XIX(1)(a).  Plaintiff's position is consistent with the deposition testimonies of Karl Kampe, from the Civil Service Commission, and Timothy Carr, a union official, whose testimonies contradict the existence of a well-known and rigid twenty-six week probation requirement.   See Kampe Dep. 43:7-43:24; Corr Dep. 54:22-55:10.[4]

---

[4] Kampe provided the following deposition testimony:
>     Q.   [W]hat are the [probationary] week durations?
>     A.   I believe it's eight to 26 weeks.
>     Q.   Eight weeks being the minimum, 26 weeks being the
>          maximum?
>     A.   Correct.
>     Q.   So depending on the nature of the position, just
>          to clarify, an employee can be given a
>          probationary period between eight weeks and 26
>          weeks, is that correct?
>     A.   That's correct.
>     Q.   Do you know if there's a standard probationary
>          period for a position of urban planner?

The Court finds that there is an issue of fact as to whether the CBA unequivocally require a twenty-six week probationary term. The terms of the CBA are vague, and it is possible that a twenty-four week period, which is within the time provided for in the Rules, is the type of "new" period contemplated in the CBA.

In further support of their clerical error argument, Defendants state that Bourne informed Plaintiff that her probationary period would be for twenty-six weeks. Plaintiff disputes this, and states that Bourne changed her position several times, and at times referred to a twenty-four week period, while at

---

A.   I would assume for the moment, without looking at the rules, that that comes under the general eight to 26 weeks.

Corr testified:

A.   Well, there's a Section 10 of the collective bargaining agreement talks about employee must serve 26 weeks before they - - I'd have to read it. I'd have to pull it out and read it. It talks about 26 weeks of service before they become- I don't know if it says permanent, but I know it's before they get their disciplinary protections.

Q.   Is there any provision in that rule that provides exceptions to the 26 weeks?

A.   Yes.

Q.   What are those exceptions?

A.   It says unless longer or fewer, something like that.

Q.   So that rule provides there can be a probationary period that is less than 26 weeks, correct?

A.   It looks that way.

Q.   Twenty-four weeks can be a probationary period, correct?

A.   Correct.

other times referencing twenty-six weeks. The Court agrees that Bourne's testimony is inconsistent, and does not resolve this issue.

On January 22, 2004, Bourne submitted a sworn affidavit to this Court in opposition to Plaintiff's motion for a preliminary injunction. In her affidavit, Bourne states, "Morgenstern was placed on probation for twenty-four weeks." (Bourne Aff. in Opp. to Prelim. Inj. ¶ 4) Bourne states in her deposition that she thought her affidavit said "twenty-six weeks", and that the "twenty-four weeks" Bourne swore to in the affidavit must have been yet another error. The Court finds Bourne's testimony to be entirely inconsistent, and insufficient to resolve this issue as a matter of law.

Moreover, although Bourne states in her deposition that County policy required twenty-six weeks of probation, Bourne's Administrative Assistant, Deanna Huminski ("Huminski"), testified that she did not know of any such policy, and that she had never been told of a mandatory twenty-six week probationary period. (Huminski Dep. 45:-45:12) Huminski, who handled personnel issues while working for Bourne, further testified that she did not recall Bourne ever telling her that there had been a clerical mistake on Plaintiff's form. (Id. 44:21-45:4.) The Court finds that there is an issue of fact as to whether a clerical error was made on Plaintiff's form, and whether the Count had a mandatory twenty-six

week probationary period for Planning Department employees.

2.   Plaintiff's Absences

Defendants argue that even if Plaintiff had a twenty-four week probation period, her probationary term was extended by the number of days that she was absent.  Plaintiff was absent for a total of 11 ½ days during her probation term, a day and one-half over the ten days allowed for in Rule XIX2(a) of the Rules. Defendants maintain that even if Plaintiff's probation period was scheduled to end on November 30, 2003, it would have been extended by 11 ½ days, the number of days that she was absent, to December 16, 2003.  In response, Plaintiff argues that Rule XIX2(a) was never applied to Planning Department employees, Plaintiff did not receive notification of such an extension, and, even if the rule were to apply, Plaintiff's probation period would only have been extended  by her amount of excess absences, here a day and one-half.

The Court finds that the parties' submissions create an issue of fact as to whether Defendants selectively applied Rule XIX2(a) because neither party has submitted any evidence indicating that the rule had been applied to Planning Department employees in the past.  However, and more importantly, there is an issue of fact as to the interpretation of the rule that precludes summary judgment.  Plaintiff interprets the rule as requiring the probationary period to be extended only by the amount of days that

Plaintiff was absent in excess of ten days. If that is the case, Plaintiff's probationary period would have been extended to December 2, and Plaintiff still would have attained permanent status by December 5. Defendants argue that the rule required an extension of 11 ½ days, the entire period Plaintiff was absent, and as such, Plaintiff still would have been on probation on December 5.

Rule XIX2(a) states,

Any periods of authorized or unauthorized absences aggregating up to ten work days during the probationary term, may, in the discretion of the appointing authority, be counted as time served in the probationary term. Any such periods of absence in excess of an aggregate of ten work days shall not be counted as time served in the probationary term. The probationary term of an employee shall be extended by the number of work days of his/her absence which, pursuant to this section, are not considered as time served in the probationary term.

The Court interprets this Rule as requiring the extension of an employee's probation by the number of days which are not considered as time served. Pursuant to the first sentence, any periods of absences aggregating up to ten days <u>may</u> be counted as time served. As such, the appointing authority has the ability to either count the first ten absences, or discount these days when calculating time served. The second sentence states that any periods in excess of an aggregate of ten work days will not be counted as time served. Thus, the rule clearly allows a probation

period to be extended by the amount of days an employee is absent in excess of ten days, because the additional days are not considered time served. However, the rule does not require discounting the first ten absences, and as such, there does not appear to be any mandatory requirement in the rule that a probation period be extended by the <u>entire</u> amount of absences.

Defendants cite to <u>Tufo v. D'Aliso</u>, 791 N.Y.S.2d 581 (2d Dep't 2005) in support of their argument that Plaintiff's probation must be extended by 11 ½ days, her entire amount of absences. However, <u>Tufo</u> is not dispositive in this case. In <u>Tufo</u>, the plaintiff's probation term was extended pursuant to Westchester County Civil Service Rule 11.2, which states that "if a probationary employee is absent for more than 10 days, that employee's probationary period may be extended by the entire period missed." <u>Id.</u> at 582. By letter, the Commissioner of the Westchester County of Public Safety informed the plaintiff prior to his termination that his probation period would be extended by his entire amount of absences.

In this case, Rule XIX2(a) gives Defendants discretion to consider the first ten absences as time served, and mandates that Defendants discount any absences over the first ten. If Defendants decided to discount Plaintiff's first ten days, or if they had a regular policy of not counting any absences towards time served, then they would have the ability to extend Plaintiff's probation by

the entire amount of her absences, here 11 ½ days. However, unlike Tufo, where the plaintiff received a letter reflecting the defendants' decision, here there is no evidence that Defendants decided to discount Plaintiff's first ten days. In fact, Defendants do not argue that they decided to discount the first ten days; they maintain that the Rule requires an extension by the entire amount of absences, an interpretation that the Court disagrees with.

The evidence currently before the Court does not conclusively resolve the issue of whether Defendants decided to discount Plaintiff's first ten absences, and as explained above, the Court does not interpret the rule as mandating an extension by the entire period of absences. Accordingly, an issue of fact remains as to whether Defendants extended Plaintiff's probation period pursuant to Rule XIX2(a), and if Defendants did extend the period, whether the extension was for a day and one-half, or for 11½ days. Because several issues of fact exist, the Court cannot determine at this stage whether Plaintiff had a property interest in her employment, and therefore DENIES Defendants' motion for summary judgment on Plaintiff's Section 1983 procedural due process claim.

B.   First Amendment Retaliation Claim

Plaintiff alleges that Defendants terminated her employment in retaliation for Plaintiff's complaints about the

alleged improper activities committed by the County.  To establish
a First Amendment retaliation claim, Plaintiff must prove that:
"(1) [she] engaged in constitutionally protected speech because
[she] spoke as [a citizen] on a matter of public concern; (2) [she]
suffered an adverse employment action; and (3) the speech was a
'motivating factor' in the adverse employment decision." Skehan v.
Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006) (citing
Gronowski v. Spencer, 424 F.3d 285, 292 (2d Cir. 2005). Defendants
argue that Plaintiff cannot establish a First Amendment violation
because as a public employee, her voiced concerns were not
"speech", and because Plaintiff cannot show a nexus between her
complaints and her termination.

    1. Whether Plaintiff's Complaints Constituted "Speech"

    Pursuant to the Supreme Court's recent decision in
Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 689
(2006), before an employee's speech is entitled to First Amendment
protection, the Court must first determine whether Plaintiff was
speaking pursuant to her official duties.  Garcett, 126 S. Ct. at
1960; see also Reuland v. Hynes, 460 F.3d 409, 415 n.5 (2d Cir.
2006).  In Garcetti, the Supreme Court reiterated a basic premise
it first set forth in Connick v. Myers: "while the First Amendment
invests public employees with certain rights, it does not empower
them to 'constitutionalize the employee grievance.'" Garcetti, 547
U.S. at 421 (quoting Connick v. Myers, 461 U.S. 138, 154, 103 S.

Ct. 1684, 75 L. Ed. 2d 708 (1983)). "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id.

Here, Plaintiff alleges that she was exercising her First Amendment rights when she voiced concerns regarding (1) requests for proposals and the lack of a formal solicitation process for work performed for Nassau County, (2) irregularities in data collection regarding the Economic Development initiative, (3) whether the County was complying with environmental regulations, (4) that the Economic Development meetings were being used as a venue for politicking, and (5) that certain County employees were misusing County funds. In line with this recent decision, Defendants argue that Plaintiff's speech is not constitutionally protected because it was made pursuant to the performance of Plaintiff's duties as a Planning Department employee. More specifically, Defendants argue that Plaintiff's comments regarding (1) the process for requests for proposals were made in connection with her work on the transfer and development of the Grumman property, (2) irregularities in data collection were made while Plaintiff was working on the Economic Development project, and (3) her comments about the County's compliance with environmental laws were made pursuant to her work on the Building Consolidation Plan.

The Court agrees that Plaintiff's voiced concerns regarding the requests for proposals, irregularities in data collection, and the County's adherence with environmental laws were made pursuant to Plaintiff's official duties. See Garcetti, 126 S. Ct. at 1960.

As part of her responsibilities on the economic development project, Plaintiff was asked to research basic characteristics and problems within Nassau County communities, and provide profiles of the economic development in these communities. (Defs.' 56.1 Stmt. ¶ 83.) If there were irregularities in the data collection associated with the project, it would be within Plaintiff's duties to report the irregularities to assure that the profiles are accurate. Plaintiff admits that she "considered it part of her job to raise concerns regarding the Economic Development initiative." (Pl.'s 56.1 Stmt. § 87.) Although Plaintiff adds the caveat that she did not consider it part of her job duties as a Planner to raise concerns about improper conduct, the Court disagrees. "Determining whether speech is made in the course of one's employment or as a citizen is a fact intensive inquiry[;] Courts cannot simply look to a broad job description." Hoover v. County of Broome, No. 07-CV-0009, 2008 U.S. Dist. LEXIS 31485, at *13-14 (N.D.N.Y Apr. 15, 2008). While Plaintiff's official job duties as a Planning Department employee may not have included raising concerns about perceived improprieties, the Court finds that Plaintiff had an ad hoc responsibility to report any

irregularities in data collection on a project that Plaintiff was working on.

The Court also finds that Plaintiff's concerns about politicking during meetings was also within her official duties. As an active member of the Economic Development initiative, Plaintiff would have wanted to ensure that the meetings were used effectively and that the other committee members were considering the research that Plaintiff presented at these meetings. If the other committee members were discussing politics rather than the Economic Development project, it would have been within Plaintiff's duties to raise a concern about the inappropriate topic.

Similarly, Plaintiff's complaints regarding the lack of a formal solicitation process for work performed for Nassau County were made pursuant to Plaintiff's involvement in the transfer and development of the Grumman property. In fact, Plaintiff raised her concerns before a committee that she served on to oversee the transfer of the Grumman property, and thereafter, the committee, with Plaintiff's assistance, developed a formal protocol for issuing requests for proposals. (Defs.' 56.1 Stmt. ¶¶ 94, 95.) It was within Plaintiff's responsibilities as a Planning Department employee, and particularly an employee who worked on the transfer and development of real estate, to raise concerns regarding the County's requests for proposals procedure, and to develop a solution for this problem.

Lastly, Plaintiff's voiced concerns about the County's compliance with environmental codes is undoubtably within her official duties. Plaintiff was working at the time on a Building Consolidation Plan, and raised these concerns in connection with the Building Consolidation Plan. (Pl.'s 56.1 Stmt. § 98.) It is expected for an employee working on a building plan to raise concerns about noncompliance with environmental codes.

However, the Court finds that Plaintiff's complaints regarding the misuse of funds for political fund-raising were not made pursuant to her official duties. Plaintiff did not raise this issue in connection with one of the projects that she was working on, or before a committee that she was a member of. Considering the record as a whole, the Court cannot find that Plaintiff's complaints regarding the misuse of funds were within any of Plaintiff's responsibilities, or had any connection to Plaintiff's assigned projects. Because the Court finds that Plaintiff's complaints regarding the misuse of funds was not within her official duties, the Court must consider whether these comments touched upon an issue of public concern. See Skehan, 465 F.3d at 105-06 ("If a public employee is not speaking pursuant to his official duties, the analysis is different . . . .")

### 2. Public Concern

It is well established that a "governmental employer may impose certain restraints on the speech of its employees,

restraints that would be unconstitutional if applied to the general public." City of San Diego v. Roe, 543 U.S. 77, 125 S. Ct. 521, 523, 160 L. Ed. 2d 410 (2004). But a public employee does not forfeit First Amendment rights in exchange for a paycheck. See Connick, 461 U.S. at 140. Most notably, courts have protected a public employee's right to comment on matters of public concern. See Roe, 543 U.S. at 82-83; DePace v. Flaherty, 183 F. Supp. 2d 633, 636-37 (S.D.N.Y.). The rationale for affording this protection is that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." Roe, 543 U.S. at 82.

"Whether the speech addresses a matter of public concern is a question of law to be decided by the court" taking into account "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 146-47; Skehan, 465 F.3d at 106 (citing Gronowski, 424 F.3d at 292). Within this construct, the Court must determine whether Plaintiff's speech concerns a "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." Roe, 125 S. Ct. at 526. If the speech "relates to any matter of political, social, or other concern to the community," it relates to a matter of public concern. Reuland, 460 F.3d at 416 (internal quotations and

citations omitted).

The Court finds that Plaintiff's comments regarding the misuse of County funds for political fund-raising touches upon matters of great importance to the general public. Clearly, the general public would be interested in the improper use of public funds for political purposes. _See_ _Lewis v. Cowen_, 165 F.3d 154, 164 (2d Cir. 1999) (speech concerning public revenue "plainly implicates a matter of public concern."); _Kolb v. Camilleri_, No. 02-CV-0117A, 2008 U.S. Dist. LEXIS 59549, at *24 (W.D.N.Y. Aug. 1, 2008) (finding that "plaintiff's criticism of wasteful government spending clearly addresses a matter of public concern."); _Hueston v. City of New York_, No. 00-CV-9512, 2005 U.S. Dist. LEXIS 253, at *23 (S.D.N.Y. Jan. 7, 2005) ("Plaintiff's statements addressed an issue of fundamental importance to local government--the use and misuse of public funds."). Here, Plaintiff's speech regarding the misuse of County funds plainly involved a matter of public concern.[5]

---

[5] Once the Court determines, as a matter of law, that an employee's speech relates to a matter of public concern, "defendants may nevertheless escape liability if they can demonstrate that . . . the public employee's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the public employee's expression." _Skehan_, 465 F.3d at 106 (citing _Cobb v. Pozzi_, 352 F.3d 79, 91 (2d Cir. 2003). The Court, however, does not undertake this analysis as the Defendants have made no argument in support thereof. _See_ _id._; _Reuland_, 460 F.3d at 418-19.

C.  Adverse Employment Action

The Court next considers whether Plaintiff has shown that she suffered an adverse employment action.  Plaintiff argues that she was terminated in retaliation for her protected speech; Defendants maintain that Plaintiff cannot establish a causal connection between her speech and the termination because Cancellieri was the sole arbiter of Plaintiff's termination, and Cancellieri was never made aware of Plaintiff's comments. According to Defendant, Cancellieri terminated Plaintiff solely because of the derogative comments Plaintiff allegedly made into the microphone in the Legislative Chamber on December 4, 2003.

To prevail on her First Amendment retaliation claim, Plaintiff must establish a causal connection between her protected speech and Defendants' alleged adverse employment actions.  The causal connection must be sufficient to support a finding that "the speech was a substantial or motivating factor in the adverse action."  Reuland, 460 F.3d at 415.  Even if Plaintiff establishes a sufficient causal connection, Defendants can still prevail on a motion for summary judgment if they can "show that [they] would have taken the same adverse employment action" despite Plaintiff's protected speech.  Cotarelo v. Sleepy Hollow Police Dep't, 460 F.3d 247, 252 (2d Cir. 2006) (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).  In determining the existence of a causal connection

between the protected speech and the alleged retaliatory action, the Court is mindful that "[c]ausation generally is a question for the finder of fact." <u>Depace v. Flaherty</u>, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002).

Here, Defendants argue that Plaintiff's termination had nothing to do with her First Amendment speech, but was entirely in response to the derogatory comments Plaintiff allegedly made that were broadcast throughout One West.  In support of this argument, Defendants cite to Cancellieri's deposition, wherein Cancellieri states that he alone made the decision to terminate Plaintiff in response to the December 4 microphone incident, and an e-mail sent from Cancellieri to John Donnelly on the day after the incident, wherein Donelly states, "Please effectuate the termination of George [sic] Morgenstern ASAP, effective today, Friday, December 5th." (Haber Dec. Ex. EE).  Plaintiff denies having made derogatory comments, and states that Defendants' proffered excuse is pretext. In support of this argument, Plaintiff cites to Defendants inconsistent testimony regarding their reasons for Plaintiff's termination.  Indeed, Bourne testified in an Affidavit submitted to this Court that Plaintiff's termination was due to her poor work performance; the Affidavit does not mention Plaintiff's comments over the microphones.  (Bourne Aff. in Opp. to Prelim. Inj. ¶¶ 10-27.)  In contrast, Cancellieri testifies that the termination was solely due to Plaintiff's derogatory comments.

The Court finds that there is a question of fact as to whether Plaintiff was terminated because of her comments regarding the misuse of County funds for political fundraising. Although Plaintiff has not provided any direct proof of retaliatory animus, there is sufficient circumstantial evidence to raise a question of fact on this issue. Plaintiff's termination was relatively close in time to the negative media attention given to Nassau County officials who were accused of misusing public funds. Additionally, Defendants' presented reasons for Plaintiff's termination are inconsistent, and range from her allegedly poor work performance, for which they have provided no documentation, to her comments over the loud speaker, which Plaintiff alleges she never made. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. N.Y. 2001) ("[A] jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."); Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir. 1999) (holding that where inconsistent reasons are presented for justifying a plaintiff's termination, the "job of reconciling them (or not) belongs to the factfinder and is not appropriate for resolution as a matter of law.").

Because the Court finds that there is an issue of fact as to whether Plaintiff was retaliated against for her comments about the misuse of County funds, the Court DENIES Defendants' motion for

summary judgment on Plaintiff's First Amendment retaliation claim.

D.    Qualified Immunity And Personal Involvement Of Named
      Defendants

Defendants argue that Plaintiff cannot maintain a Section 1983 action against the named Defendants because of a lack of personal involvement and qualified immunity.

1. Personal Involvement

In order to state a claim against an individual defendant pursuant to 28 U.S.C. § 1983, a plaintiff must allege the defendant had "personal involvement" in the unconstitutional action.   See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004).  Where the target of a plaintiff's allegations is a supervisor, or other high ranking official, the Second Circuit has explained:

> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation.  Personal involvement can be shown by [] evidence that:  (1)  the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

Id. at 127 (citations omitted).

Here, Plaintiff argues that Defendant Suozzi was personally involved in Plaintiff's termination because "he personally rubber-stamped the unlawful termination . . . ." (Pl.'s Mem. p. 18.) In support of this assertion, Plaintiff cites to Defendant Cancellieri's deposition testimony, wherein Cancellieri discusses his conversation with Suozzi regarding Plaintiff's termination. Plaintiff argues that Cancellieri's deposition reveals that Suozzi approved the termination and therefore sanctioned Defendants' alleged unlawful behavior. The Court disagrees. Cancellieri's deposition reveals nothing more than that Cancellieri informed Suozzi that Cancellieri had decided to terminate an employee because she misused County property and made inappropriate comments over the County microphone. Cancellieri's deposition does not reveal that Suozzi was informed that Plaintiff was not given a hearing prior to her termination, or of any other facts regarding Plaintiff's allegations in this lawsuit.[6] Rather,

---

[6] Cancellieri testified as follows:
    Q.   Did you ever have any discussions with Mr. Suozzi
         about [the December 4, 2003 microphone] incident
         that the people reported to you?
    A.   Yes.
    Q.   When did you first have a discussion with Mr.
         Suozzi about it?
    A.   I don't know if it was a few days later, I
         informed him of what had transpired, and that I
         had ordered that this employee, because of the
         misconduct and the misuse of the property, of the
         County property, be terminated. So it was more of
         an informational thing.

the testimony reveals only that an employee had a routine conversation with his superior regarding the decision to terminate a subordinate employee. There is no evidence that Suozzi made the decision to terminate plaintiff. In fact, Plaintiff had <u>already</u> been terminated at the time of Cancellieri's conversation; Cancellieri merely informed Suozzi that the termination had occurred. There is no evidence that Suozzi was involved whatsoever in the decision to terminate Plaintiff. <u>See</u> <u>Isaacs v. City of New York</u>, No. 04-CV-5108, 2005 U.S. Dist. LEXIS 35292, at *29 (S.D.N.Y. Dec. 16, 2005) (dismissing Section 1983 action where "no reasonable fact finder would conclude that [the defendant] caused [plaintiff's] termination.").

Moreover, the record as a whole with all ambiguities resolved in Plaintiff's favor, does not indicate that Suozzi was personally involved in the alleged constitutional violation, created a policy or custom of unconstitutional practices, was grossly negligent in his supervision, or that Suozzi exhibited deliberate indifference to an unconstitutional act. As a whole, there is no evidence that Suozzi was aware of any of Plaintiff's allegations of constitutional violations. Accordingly, Plaintiff cannot maintain a Section 1983 action against Suozzi. <u>See</u> <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 229 (2d Cir. 2004) (affirming summary judgment dismissing Section 1983 claim against

_____

Cancellieri Dep. 93:19-94:6.

individual defendants because there was no evidence of the defendants' personal involvement or even knowledge of the alleged wrongdoing); Morrison v. Johnson, No. 01-CV-636, 2006 U.S. Dist. LEXIS 70405, 68-69 (N.D.N.Y. Sept. 28, 2006).

However, Plaintiff has sufficiently asserted the personal involvement of Defendant Bourne, Cancellieri, and Donnelly. Cancellieri made the decision to terminate Plaintiff, and both Bourne and Donnelly assisted in the termination process. The Court has already found that there is a question of fact as to whether Plaintiff was entitled to a hearing prior to her termination, and accordingly, whether Defendants violated Plaintiff's due process rights. Because Cancellieri, Bourne, and Donnelly each directly participated in Plaintiff's termination, they would have been in the unique position to know whether Plaintiff was entitled to a hearing, and as such, there is a question of fact as to their personal involvement.

2. Qualified Immunity

Having determined that a Section 1983 claim could be made out on a favorable view of the facts, and having already dismissed Defendant Suozzi, the Court considers the remaining Individual Defendants' (Cancellieri, Bourne, Donnelly) claim of qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (stating that the threshold question, before passing on qualified immunity, is whether the facts alleged

show a constitutional violation); <u>Salahuddin v. Goord</u>, 467 F.3d 263, 273 (2d Cir. 2006) ("First, we must consider whether the plaintiff's factual allegations, both those unchallenged and those as to which the record creates a genuine dispute, show the official's conduct violated a constitutional or statutory right . . . . This first inquiry is the same as the one we undertake in assessing a summary-judgment motion.") (internal quotation marks omitted).

Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); <u>see</u> <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995). In order to establish entitlement to qualified immunity, Defendants must demonstrate that either (1) their actions did not clearly violate Plaintiff's Fourteenth Amendment rights or (2) it was objectively reasonable for them to believe their actions did not violate Plaintiff's Fourteenth Amendment rights. <u>See</u> <u>Salim v. Proulx</u>, 93 F.3d 86, 89 (2d Cir. 1996).

The Court denies the Individual Defendants' request for qualified immunity. Plaintiff contends, among other things, that she did not receive a hearing prior to her termination and that she

had already reached permanent employee status at that time. As explained above, the alleged conduct by the Individual Defendants, if proven true, would constitute a violation of Plaintiff's well-established Fourteenth Amendment rights.

Nevertheless, the Individual Defendants are entitled to summary judgment if, viewing the record most favorable to Plaintiff, "no reasonable jury . . . could conclude that it was reasonable for the defendant[s] to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right." Lennon, 66 F.3d at 420 (internal quotation marks omitted). "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." Id. Here, Plaintiff not only alleges that she already attained permanent status, but also that there was no clerical error regarding Plaintiff's status. If these allegations are proven true, no reasonable jury could find that it was reasonable for the Individual Defendants to terminate Plaintiff without a hearing. Likewise, if Plaintiff was in fact terminated because of her comments regarding the improper use of County funds, no reasonable jury could find that it was reasonable to terminate Plaintiff because of these remarks.

Moreover, granting summary judgment based on qualified immunity is improper if genuine issues of material fact exist. See

43

<u>id.</u> at 421.  As mentioned above, material facts are in dispute here.  Accordingly, Defendants Bourne, Cancellieri, and Donnelly are not entitled to qualified immunity.

III. <u>Breach Of Contract Against The County</u>

The County argues that it is entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiff failed to follow her Collective Bargaining Agreement's ("CBA") grievance procedure.

Under New York law, it is well settled that:

when an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract. Unless the contract provides otherwise, only when the union fails in its duty of fair representation can the employee go beyond the agreed procedure and litigate a contract issue directly against the employer.

<u>Bd. of Educ., Commack Union Free School Dist. v. Ambach</u>, 70 N.Y.2d 501, 508, 522 N.Y.S.2d 831, 517 N.E.2d 509 (1987).  However, an exception to this requirement arises where "(1) the employer's conduct amounts to a repudiation of the contractual procedures or (2) the grievance procedure is controlled by the union and the employee has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance." <u>Heyer v. Morris Okun, Inc.</u>, No. 03-CV-2218, 2003 U.S. Dist. LEXIS 14495, at *11 (S.D.N.Y. Aug. 19, 2003) (<u>quoting</u> <u>White v. White Rose</u>

<u>Food</u>, 930 F. Supp. 814, 822 (E.D.N.Y. 1996)).

The County argues that Plaintiff did not exhaust her administrative procedures and failed to file a grievance through her union. It is undisputed that Plaintiff visited Tim Corr, a union representative, after Plaintiff's termination. Corr asked Plaintiff to return with documentation. However, Plaintiff argues that she did not return because Corr informed her that he would not be able to help since Plaintiff was still on probation. Plaintiff argues that this response did not satisfy the Union's duty of fair representation. She further argues that the County repudiated the collective bargaining agreement by stating that the CBA does not apply to Plaintiff because she was on probationary status.

The Court finds that there are issues of fact regarding Plaintiff's breach of contract claim. On the one hand, the County argues that Plaintiff should have followed the grievance procedure outlined in the CBA. On the other, the County argues that Plaintiff is not entitled to the disciplinary protections of CBA because she was still a probationary employee. This inconsistent argument may amount to a repudiation of the contract. <u>See</u> <u>Cabarga</u> <u>Cruz v. Fundacion Educativa Ana G. Mendez, Inc.</u>, 822 F.2d 188, 192 (1st Cir. 1987) (affirming district court's finding that employer repudiated collective bargaining agreement by arguing that the employee was not covered by the collective bargaining agreement). Because there are still issues of fact with regard to whether the

County repudiated the contract, and whether a pursuit of the grievance proceedings with the union would have been futile, the Court DENIES summary judgment for the County on Plaintiff's breach of contract claim.

IV.  New York State Civil Service Law Claim

Plaintiff alleges that Defendants violated New York Civil Service Law § 75 by terminating Plaintiff without a notice and hearing.  Defendants argue that they did not violate the Civil Service Law because Plaintiff was a probationary employee and thus not entitled to a notice and hearing.  New York Civil Service Law § 75 states that a "person holding a position by permanent appointment in the competitive class of the classified civil service" shall not be terminated "except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section."  Because the Court has already found that there is an issue of fact as to whether Plaintiff was a permanent employee at the time of her termination, the Court cannot grant summary judgment for Defendants on this claim.

V.  Defamation Claim

Defendants argue that they are entitled to summary judgment on Plaintiff's defamation claim because (1) Plaintiff's name is not mentioned anywhere in the N.Y. Times article, (2) the Newsday Article does not contain any false statements pertaining to Plaintiff, and in any case, the statements in the Newsday Article

46

are nothing more than hyperbole, and (3) Defendants are entitled to qualified immunity for their comments.

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001). Here, although the alleged defamatory words were written in newspaper publications, Plaintiff's action is against those who spoke the words to the reporters, and thus lies in slander rather than libel. "The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) "of and concerning" the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." Id. at 266.

Defendants first argue that the comments made in the articles are not defamatory because they are not "of and concerning" Plaintiff. According to Defendants, neither Plaintiff nor the Planning Department are mentioned anywhere in the N.Y. Times article, and Cancellieri did not make any false statements about Plaintiff in the Newsday Article because the comment regarding "dead wood" was not about Plaintiff.

The "'of and concerning' requirement is generally a question of fact for the jury, although it can be decided as a matter of law where the statements are incapable of supporting a

jury's finding that the allegedly libelous statements refer to a plaintiff." Magdalena Ty & New Calubayan Trading Corp. v. Celle, No. 95-CV-2631, 1997 U.S. Dist. LEXIS 4456, at * 5-6 (S.D.N.Y. Apr. 8, 1997) (quoting Anyanwu v. Columbia Broadcast Systems, Inc., 887 F. Supp. 690, 692 (S.D.N.Y. 1995). The Court finds that the comments could be considered to be "of and concerning" Plaintiff. Cancellieri's comment regarding "dead wood" is followed a few paragraphs later with his comment that Morgenstern "failed to live up to the standards of Nassau County." A reader of the Article could reasonably believe that Morgenstern was the "dead wood" Cancellieri refers to in the beginning of the Article, and it cannot be said that the comments in the Newsday Article are incapable of supporting a jury's finding that the comments are about Plaintiff. See Magdalena Ty, 1997 U.S. Dist. LEXIS 4456 at * 5-6 (rejecting defendant's argument that the statements were not about plaintiffs because "it is reasonable for persons who know plaintiffs to conclude that [the] allegedly defamatory statements were of and concerning them.").

The Court further finds that the statements in the Newsday Article could be actionable as a mixed statement of fact and opinion. "New York case law makes clear that 'a subjective characterization of the plaintiffs['] behavior and an evaluation of her job performance . . . constitute[s] a nonactionable expression of opinion.'" Joyce v. Thompson Wigdor & Gilly LLP, No. 06-CV-

15315, 2008 U.S. Dist. LEXIS 43210, at *21 (S.D.N.Y. June 3, 2008) (quoting <u>Farrow v. O'Connor, Redd, Gollihue & Sklarin, LLP</u>, 857 N.Y.S.2d 235 (2d Dep't 2008)). However, "when the publication is made externally . . . assessments of work performance have been considered actionable assertions of fact or of mixed opinion." <u>Qureshi v. St. Barnabas Hosp. Ctr.</u>, 430 F. Supp. 2d 279, 289 (S.D.N.Y. 2006). Here, Cancellieri's comments were made externally to a local newspaper, and as such could be considered to be an actionable statement of mixed fact and opinion. <u>See</u> <u>Purgess v. Sharrock</u>, 33 F.3d 134, 140 (2d Cir. N.Y. 1994) ("Under the circumstances, [the] statements were representations of fact that defamed [plaintiff] by falsely portraying his professional conduct.").

Although Plaintiff may have a claim of defamation with respect to the Newsday Article, the Court agrees that the N.Y. Times Article does not support a claim of defamation. Neither Plaintiff nor the Planning Department are mentioned anywhere in the Article. It is not necessary for Plaintiff to be named directly, but there must be a showing that Plaintiff is "clearly identifiable in [the] allegedly defamatory statement to support a claim for defamation." <u>Algarin v. Town of Wallkill</u>, 421 F.3d 137, 139 (2d Cir. 2005) (citation and quotation omitted). Here, it cannot be said that Plaintiff is identifiable from the N.Y. Times Article. The Article discusses the controversy surrounding certain Nassau

49

County officials, and makes one vague reference to "the firing of three Sylver aides, some of whom had been no shows for months." The County had numerous employees, and it cannot be said that this vague comment is attributable to Plaintiff. Moreover, none of the Individual Defendants are quoted as making the above comment, and Plaintiff has not made any other showing that the Defendants are responsible for the comment. Thus, Plaintiff cannot maintain an action for defamation based on the comments in the N.Y. Times Article.

Because the Court has found that Cancellieri's comments in the Newsday Article could be defamatory, the Court now turns to whether Cancellieri is entitled to immunity for the comments. "Under New York law, where a speaker communicates information on a subject matter in which he has an interest, or in reference to which he has a duty and such information is communicated to a person with a corresponding interest or duty, a qualified privilege exists which could only be overcome by a showing of malice on the part of Defendant." Perkins v. City of New Rochelle, No. 00-CV-0725, 2001 U.S. Dist. LEXIS 24945, 26-27 (S.D.N.Y. Sept. 6, 2001).

Defendants argue that Cancelleri, as a government official, is subject to a qualified privilege because his comments were "upon a subject in which he had an interest, or a legal, moral, or social duty to speak, [and] the communication was made to a person having a corresponding interest or duty." Peters v.

<u>Baldwin Union Free Sch. Dist.</u>, 320 F.3d 164, 169 (2d Cir. N.Y. 2003). Plaintiff argues that the qualified privilege does not apply because Cancellieri spoke to the media, and not to another person having the same interest or duty, and the general public was not a member of the same organization as Cancellieri.

However, the Court finds that Cancellieri is entitled to a qualified privilege for his comments. Cancellieri is a high-ranking public official who made comments, pursuant to his role as Deputy County Executive, regarding a public scandal. The general public, particularly readers of Newsday, a Long Island publication, would undoubtably have an interest in a scandal involving public funds and a government entity. Courts have routinely applied privilege in such situations, and "have approved the application of a conditional privilege to the use of the media, or some portion of the media, when the speaker had an interest in informing a widely dispersed audience of certain facts, or likely members of the audience of the chosen media had a legitimate interest in learning those facts, particularly in the absence of any more narrowly focused means of communication with those individuals." <u>Konikoff v. Prudential Ins. Co. of Am.</u>, No. 94-CV-6863, 1999 U.S. Dist. LEXIS 13501, at * 60-61 (S.D.N.Y. Aug. 31, 1999).

As a Deputy County Executive, Cancellieri had a duty to speak to the residents of Long Island about the scandal and investigation involving high-level County officials. <u>See</u> <u>Hagemann</u>

v. Molinari, 14 F. Supp. 2d 277, 281-288 (E.D.N.Y. 1998) (statements of Staten Island Borough President to the media regarding former project planner's termination were subject to immunity because the public had an interest in the subject since "an attack upon high-ranking government employees lowers public confidence"); Lombardo v. Stoke, 18 N.Y.2d 394, 400, 222 N.E.2d 721, 276 N.Y.S.2d 97 (1966) (finding that members of the Board of Education "should be free to report to the public on appropriate occasions without fear of reprisal by civil suit for damages. Particularly . . . when so much attention has been directed toward . . . the administration of [the] school systems, it is essential that the public be candidly and promptly informed of the merits underlying such charges.") (internal citations and quotations omitted). This is particularly true here, where Plaintiff contacted Newsday herself and commented that she believed that she "was fired because [she] was a liability to Tom Suozzi." Cancellieri, who was contacted for the Article, would have a responsibility to respond to such allegations.

To overcome this privilege, Plaintiff has to show that Cancellieri acted with malice. See Shapiro v. Health Ins. Plan of Greater New York, 7 N.Y.2d 56, 61, 163 N.E.2d 333, 194 N.Y.S.2d 509 (N.Y. 1959) ("When defendant's statements are presumptively privileged the rule is that, in order to render them actionable, it is incumbent on the plaintiff to prove that they were false and

that the defendant was actuated by express malice or actual ill-will." (internal citation and quotation omitted). Plaintiff argues that Cancelleri made the statement "despite having failed to check her civil service status and work performance." (Pl.'s Mem. in Opp. p. 24). However, the Court finds it irrelevant whether Cancellieri checked Plaintiff's work performance, because Cancellieri alleges that he terminated Plaintiff because of the December 4th microphone incident, and not because of her work status.

Plaintiff's argument that Cancellieri failed to check her status is only relevant to Cancellieri's statement that Plaintiff was still on probation. The statement that Plaintiff was still on probation at the time of her probation is not defamatory, because there is nothing about that statement that would cause Plaintiff harm or constitute slander per se. Rather, the allegedly defamatory statements are Cancellieri's reference to "dead wood" and, perhaps, his statement that Plaintiff did not meet the County's standards. Checking Plaintiff's status has no relevance on those two comments. Thus, the Court finds that Plaintiff has failed to show that Cancellieri made his comments with a "high degree of awareness of their probable falsity." <u>Brown v. AstraZeneca Pharms., L.P.</u>, No. 03-CV-6166, 2006 U.S. Dist. LEXIS 57377, at *39 (E.D.N.Y. Aug. 16, 2006). Accordingly, the Court GRANTS Defendants' motion for summary judgment on Plaintiff's

defamation claim.

VI.  <u>New York Human Rights Law Retaliation Claim</u>

Defendants move for summary judgment on Plaintiff's New York Human Rights Law ("NYSHRL") retaliation claim.  The Court need not address Defendants' arguments because Plaintiff has voluntarily dismissed her NYSHRL claim.  (Pl.'s Mem. in Opp. p. 25 n.11.)

<u>CONCLUSION</u>

For the reasons stated above, the Court DENIES Defendants' motion for summary judgment on Plaintiff's (1) First and Fourteenth Amendment Retaliation Claim, brought pursuant to 42 U.S.C. § 1983, (2) breach of contract claim, and (3) New York Civil Service Law § 75 claim. The Court GRANTS Defendants' motion for summary judgment on Plaintiff's (1) defamation claim, and (2) Section 1983 claim against Defendant Suozzi. Plaintiff may proceed with her Section 1983 claim against all Defendants except for Defendant Suozzi. Additionally, the Court DENIES Plaintiff's motion to strike the Affidavits of Lorna Goodman and Donald Hohm, but GRANTS Plaintiff's motion to strike the Affidavit of Edward Mellina.

The parties are directed to appear before this Court on October 24, 2008, at 10:30 a.m. for a pre-trial conference.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     Central Islip, New York
           September  29 , 2008